### MEANS and another *v.* REES and others.

*(Circuit Court, E. D. Tennessee, S. D.  January 4, 1886.)*

SALE OF STOCK—RESCISSION OF CONTRACT—FRAUD—MISTAKE—EVIDENCE.
      No fraud, deceit, or mutual mistake justifying a rescission of the contract sought to be avoided being shown, the bill is dismissed.

In Equity.
*R. L. Bright* and *De Witt & Shepherd,* for complainants.
*Key, Richmond & Clark* and *Wheeler & Marshall,* for respondents.

KEY, J. The bill in this case was filed by complainants in the chancery court of the state of Tennessee, in February, 1883. The cause was removed by respondents into this court. The bill alleges that respondent Rees, and his agent, respondent Wilder, sold them one-half the stock in the Roane Mountain Steel & Iron Company, a corporation created by the state of North Carolina, for the price of $71,-500. This company had stock to the amount of $143,000. Complainants aver that, in making the trade, they relied upon the representations of Rees and Wilder as to the quantity of land belonging to the company, its character, cost, and value, the nature and quality of the title by which it was held, and all the general facts and ingredients which entered into their consideration in estimating the value of the stock. Complainants say that since the contract was executed they have discovered that they have been imposed upon, and that respondents' representations were false, or exaggerated to such an ex-

tent that they find a comparatively worthless purchase upon their hands, and complainants ask to have the contract rescinded and the parties placed *in statu quo.* The respondents deny all the fraud charged.

It is asserted that Wilder and Rees represented that the company owned 143,000 acres of land, which cost them and was worth one dollar per acre; that it was covered with valuable timber of great variety, had wonderful beds of magnetic iron ore, fine and abundant water-power, and fertile soil; that the great inducement with them to trade grew out of the quantity and value of the land for its timber and soil. I do not believe the record sustains this allegation. The record shows, beyond question, that the mineral properties of the land were the great and controlling matter in the purchase. Robinson, with a piece of ore taken from this land, came to Wilder to ascertain from whence the ore came, and whether the land where it was found could be purchased. The question discussed by every one, on all occasions pending the negotiations, was the ores, their quantity and quality; and the timber, water-power, and transportation were mentioned as incidental and auxiliary subjects, affecting the development and working of the mineral property. Perry and Wetherby were sent to examine the ores. When complainants went upon the property, just after the purchase of their stock, they went to investigate the ores, and confined their examination to the ores, and when, as a step towards placing their stock in the market, Prof. Wetherby was sent to make an examination of the property, his attention was directed to the ores, and his report of his investigations deals with the ores as the controlling element of value, and with the timber, water-power, etc., as incidental to and useful in developing and operating the property. It is clear that complainants' claim, that they negotiated for and purchased the stock because of the value of the lands for timber and agricultural purposes, has not been maintained successfully.

It was disclosed in the negotiations between the parties that a large amount of surface rights upon the property had been sold, but that the mineral rights had been reserved, and no objection was made on that account; and, at a later day, Means urged Wilder to convey to the company the mineral rights in some thousands of acres of land on the top of Roane mountain. The minerals were always and everywhere considered; but, though this be so, it does not follow that if Wilder and Rees have made false statements in regard to the minor and inferior elements of value in the transaction, for the fraudulent purpose of inducing complainants to purchase the stock, and if they succeeded because complainants believed and relied upon such statements, the complainants are not entitled to relief. But if complainants give unreal reasons for their action, we may look to that fact, so far as it may shed light upon the entire transaction,—upon their motives and good or bad faith in bringing their suit.

The great point of contention is as to the quantity of the land. Complainants say they believed they were purchasing 143,000 acres; that Wilder represented, as a positive fact, that there was that quantity, and they accepted his statement as a fact. They say that if they had known that the deeds, the opinion of Pettibone, the attorney who had examined and reported upon the titles, or the minutes of the company, had shown that there were but 46,000 acres of the land, they would not have purchased the stock. Wilder admits that he always stated that he believed there were at least 143,000 acres, but that he gave it as a mere opinion, and one that he believed correct. There appears to me very little in the assertion of complainants on this point. Wilder never professed to know how many acres there were. He felt quite sure there were 143,000, and thought there might be more,—there might be 160,000 or 200,000. He had made a partial survey, and, coming to the conclusion that there was largely more land than was supposed in the assessment of taxes against the company, the survey was not closed. Their taxes were but $90. The inevitable inference from all this is that the general understanding of the tax assessors and the public was that the company had greatly less than 143,000 acres. It is reasonable to presume that this conclusion was reached by examination of the recitations of the grants, or other title papers. At all events, there was so great a difference between the common estimate as to the acreage and Wilder's estimate, predicated upon a partial survey, that the survey was never completed. From this it is clear that Wilder never knew, or professed to know, the number of acres; but gave it as his firm and decided opinion always that there were 143,000 acres or more, but that the estimate of acreage has been greatly less,—so much so that the taxes on the land had been only $90. A partial survey, however, had convinced him that the area was so much larger than the estimate upon which assessments for taxes had been based, that his survey had not been closed, because, if completed, it would have shown so much larger acreage as to have very materially increased the taxation on the land. An examination or knowledge of what the papers and deeds of the company show as to this point would have added nothing to this, nor contradicted Wilder's representations in this respect; so that complainants are mistaken when they assert that they should have incontinently abandoned the negotiations had they seen that the deeds and other papers and records of the company recited that there were only 46,000 acres of the land; for these recitations do not in any sense contradict Wilder's statements. The proof shows that Wilder did have a surveyor, McElevee, to investigate the extent and boundaries of the land, and that he, after running one of the lines and examining the boundaries, reported to Wilder that, in his opinion, to close the survey would show such an increase of area as to materially increase taxation, and that the survey had better be abandoned. He estimated that the average length of the lands was

28 miles, and their average breadth 8 miles, and the number of acres of such a territory would be a fraction over 143,000. It would seem, therefore, that Wilder had formed his opinion from McElevee's report of his investigations.

The complainants, in all their explorations, appear to have kept in view the mineral character and resources of the property. According to their own statements, Perry was sent to investigate the mineral resources of the property. When they, accompanied by Prof. Wetherby, went upon and over the property a few days after the purchase, the whole attention of the party was directed to the mineral character of the lands, and when Prof. Wetherby and his party, in July, 1881, went upon the land, it was to open up and lay bare its minerals, and he spent months in exploring them. His report gives a glowing account of the mineral resources of the property, and shows that the timber, water-power, and soil are sufficient to support, develop, and operate it. A letter from complainant Means to Gen. Wilder, dated November 18, 1881, sheds much light on this branch of the case. In it he says:

"The great question as to quantity of our magnetic ores has not been definitely determined, and this fact may delay investments another season, unless Prof. Wetherby, with his limited examination of the property, feels willing to impress inquirers that there is an abundance for all practical purposes. And we must not forget that his is the only positive knowledge we have on the subject. He has a good opinion of the property, however, though he admits it is based largely on local information and conjecture."

Complainants had been upon the ground, Wetherby had made his report, and it was all that complainants could have desired. Ten months almost had gone by since the stock had been purchased,—a period ample for all kinds of investigation,—and the stockholders of the Roane Mountain Steel & Iron Company met in Cincinnati, complainants among them, and increased the capital stock of the company to $500,000—$300,000 of an increase,—notwithstanding nothing had been added to the property save the mineral rights to a few thousand acres of land on Roane mountain, one of the highest elevations east of the Rockies. A part of the stock was put upon the market for sale; but, notwithstanding Wilder's description, Wetherby's report, and the best efforts of complainants, who then believed all that Wilder and Weatherby said, and could speak somewhat from personal examination, not a single purchaser of the stock was found. Campbell said it had too much titanic acid, and so did Schoenberger. Murdock's friend said it would take $500,000 to make a way out for the transportation of the iron, etc., and as the property is in the midst of the highest mountains east of the Mississippi river, his estimate is likely not extravagant. The capital stock was raised March 15, 1882, and $100,000 of it placed at par in the market. Nearly two months passed away and no sales were made, and May 11, 1882, it was "resolved that the words 'not less than par,' contained in the resolution

in directors' meeting of March 15th, at 4 o'clock P. M., on page 17 of the minute-book, be hereby stricken out, and the words 'not less than forty cents upon the dollar' be inserted instead." At the expiration of another month no stock had been sold at the reduced price.

About the first of July, Wetherby went upon the property again to survey it, and ascertain the quantity of surface rights. Williams went close upon his heels to investigate titles. That such an attorney as Williams shows himself to be should have been selected by any person of intelligence, acquainted with him, for so grave a duty, passes comprehension, unless upon the theory that he would make such report of his investigation as his client might wish. At all events, Wetherby, in a much shorter time than his first examinations consumed, reports a great deficiency of area; and Williams discovers an alarming defect of titles and quantity of surface rights; and complainants concluded it was land they wanted, and not iron. In the mean time, steel had so declined in price that these magnetic ores, whose great value depended upon their steel-making qualities, greatly fell in value. No complaint is made that there is any deficiency in the quantity or quality of the ores. It is nowhere shown that these veins of ore extended for a less distance than 15 miles over the property, or that they are not abundant in ores of fine quality. Wetherby's report and Means' admissions justify Wilder's representations as to the ores.

It is also alleged that the title to a great part of the lands is defective, and that Wilder represented it as good, and that complainants accepted and acted upon his statement as to this; and much proof, some of which is incompetent, has been produced to show defects in the title. Wilder, on almost every occasion when he spoke of the matter, said that he had one of the ablest lawyers of his region of country, A. H. Pettibone, to examine and investigate the title; that he had made an abstract thereof, and given the opinion that it was good. Wilder's opinion was based on Pettibone's judgment and conclusion, and was the result of confidence in it. Complainants knew this from his conversations, and were as well prepared as Wilder to form their conclusions from his *data*, unless he asserted a falsehood as to Pettibone's examination of the question, or as to his ability and character as an attorney, which nowhere appears. The negotiations of the twenty-fifth of February, 1881, at Gen. Wilder's residence contradict this position of complainants. Complainant Means and Campbell carried to Wilder a proposition dated February 24, 1881, signed by complainants and Schoenberger and Campbell, which stated that "they had accepted your proposition" (Wilder's and Rees') "hereto attached, regarding the sale of the Roane Mountain Steel & Iron Company, of Mitchell county, North Carolina, provided that, upon further examination, the said property, title, etc., prove satisfactory to us and our associates, and as represented in your several communications to Mr. Mendenhall, Mr.

Means, and Mr. Robinson; the examination of the title, etc., to proceed at once, and examination of the property to be made as soon as weather and other engagements will permit." The proposition referred to as "hereto attached" must have been the one made to Robinson. He at once had placed himself in negotiation with complainants and their friends, and no other proposition had been made on the eighteenth day of November, 1880. It had been discussed frequently between Mendenhall and Robinson, and Means and Mendenhall. Means and Mendenhall had called upon Wilder early in February, 1881, in reference to the trade, and spent a day with him. Letters had passed between the parties. Now, if complainants had, from the first, placed such reliance upon and confidence in Wilder's representations as to the area of land and its title, why did they on the twenty-fourth day of February, 1881, in their proposition of acceptance, provide for an examination of the property and title, so as to satisfy themselves and their associates that the representations which Wilder had made to them were true? The paper was prepared and signed by themselves. If, as complainants say, the titles had not been before them or discussed at the meetings with Wilder, how does it happen that they speak of his representations in regard to these matters, and reserve the right to investigate their truth? The offer made by Means, Mendenhall, Schoenberger, and Campbell was not satisfactory to Rees and Wilder, and, after some discussion, was not acceptable to Means and Campbell. Means and Mendenhall copied the paper they had brought, and left the copy with Rees and Wilder, and kept the original. Means drew up the offer of Rees and Wilder, and Wilder amended it, and kept a copy, and gave Means and Mendenhall one; and these two papers—that signed by Rees and Wilder, dated twenty-fifth February, 1881, and that signed by Means, Mendenhall, Schoenberger, and Campbell the day before—embodied the propositions of the parties. The Rees and Wilder proposition was substantially the one Robinson was authorized to make. They differed in some minor details. Robinson was authorized to sell Rees' stock for $100,000, but Rees was only to be paid $71,500. Robinson was to have the residue. Mendenhall and Means knew this, and the paper giving the terms was attached to the offer of twenty-fourth February, 1881. In the matter of the Robinson payment, there was no stipulation as to time of payment, nor was there any provision as to the character of subscriptions and subscribers for the stock. In their proposition of the twenty-fifth of February, 1881, Rees and Wilder met, and accepted the proposition of the twenty-fourth of February, and the offers of both parties added a new element mutually applicable to both; and that was that new subscriptions and subscribers for the new stock should be satisfactory to both parties; but, as Campbell and Schoenberger were not present to agree to the amendment to their offer of acceptance, the trade was not concluded, and awaited their ratification. About all that was left for

the parties to do was for Schoenberger and Campbell to assent to the provision that the sales of the stock of the company should be satisfactory and to satisfactory persons, and for the complainants and their associates to satisfy themselves as to the truth of Wilder's and Rees' representations as to the property, its title, etc.; and this was to be done as promptly as the nature of circumstances would admit. We find Wilder following this action of twenty-fifth of February by urging the examination stipulated for. We find complainants sending Perry to examine the property in April, before the snows had left it. On May 10, 1881, complainants wrote to Gen. Wilder:

' "We will close the contract for purchase of one-half the stock, or Mr. Rees' interest, in the Roane Mountain Steel & Iron Company, but desire that you grant us thirty days longer to make the first payment."

May 11, 1881, Wilder refers to their letter of the tenth of May, and agrees to the postponement of the first payment as desired. At most, it must be presumed that they had made the investigation they had provided for in respect to Wilder's representations, or waived it. On May 25, 1881, the papers were formally executed, transferring the stock. The various steps taken while the negotiations were pending, the history of the transaction as it appears from the papers, as well as the testimony of disinterested witnesses, seem to sustain respondents' theory of the case. At all events complainants, upon whom the burden rests of making out their case, fail to establish it by the necessary preponderance of proof.

The parties are all able, intelligent, and experienced gentlemen, filling the higher positions of society, and pursuing the higher walks of business; each man of them able to take care of himself. There is nothing of ignorance as to the nature of the transaction. They are all experienced iron men. If any of them have been disappointed in their expectations on account of the vicissitudes of business, or the fluctuations in the prices of iron and steel, arising from new inventions, discoveries, or other like causes, so that hardship and loss have resulted, or if their judgment has been in error, there can be no relief on that account. There must have been fraud, deceit, or mutual mistake, to such an extent as to have operated so far as to have brought about the contract. In other words, the fraud or mistake must have been such that the agreement would not have been made in its absence, before a rescission of the contract would be decreed.

It is not insisted, very seriously at least, that there are any grounds for relief under the bill in this case upon any mistake. No such case is made by the bill or the evidence. So far as the charge in respect to Wilder's misrepresentations as to the distance and cost of a railroad to connect the property of the company with the road running to Cranberry is concerned, it appears from the minutes of the proceedings of the stockholders and directors of the company that they at no time considered the utility of such a route; but, on the contrary, desired and encouraged the building of a railroad from the

company's property to the East Tennessee, Virginia & Georgia Railroad, without any complaint or criticism of Wilder's representations, or investigation or survey, experimental or otherwise, for a route to the Cranberry road, and all this while complainant Means was president of the company. That Wilder was exceedingly enthusiastic in regard to this property, and puffed its prospects and capabilities with the zeal of an enthusiast, is evident. This must have been apparent to complainants. The difference in his estimates or opinions as to the area of the lands of the company, and his stories as to the speckled trout, as detailed by complainants, should have put, and probably did put, complainants upon their guard and inquiry as to his statements generally. As already stated, complainants are gentlemen of ability, intelligence, and experience, and not lambs to be led to the slaughter. It is probable that when the capital stock of the company was raised to $500,000, and put in the market largely, if it had sold well, this litigation would never have taken place. Courts, however, cannot encourage men who are able to attend to their own business to delay and experiment before calling upon the courts to declare a rescission of their contracts. If suitors be not required to use diligence, courts would be overwhelmed with controversies, and business would suffer. In this case, the contract was closed May 11, 1881, and yet complainants, with every opportunity to examine the property of the company, and with the duty resting upon them to do so before inviting others to purchase interests from them, did not commence this suit until February, 1883. Complainant Means was so occupied with a canvass for mayor of Cincinnati just previous to the contract, and so immersed in the duties of that office afterwards, that he gave the contract little consideration after his and Campbell's interview with Wilder and Rees, twenty-fifth February, 1881, or to the investigation of the affairs, property, or condition of the company afterwards. It may be, and it doubtless is, patriotic to sacrifice personal interests to the public good, but I am not aware that a court of equity can find ground of relief in negligence to private business or interests so brought about.

In the immense mass of testimony in this record, relevant and irrelevant, competent and incompetent, much of conflict and disagreement appears in the personal testimony of the parties to the suit. I have not attempted to criticise or compare their discrepancies and differences, as, in my judgment, they do not change the aspect of the case as exhibited and manifested by its general features, and the documentary and other written testimony. It is a disagreeable exemplification of the weakness and deformities of the memory and understanding when we discover, as we do in this record, how far gentlemen in the highest circles of life and business can differ in their recollection and statements.

The conclusion arrived at is that the bill must be dismissed at the cost of complainants; and it is so ordered.