**SOUTHERN RAILWAY COMPANY et al., Plaintiffs,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission et al., Defendants.**

**Civ. A. No. 9586.**

United States District Court
N. D. Alabama, S. D.
July 18, 1960.

Joseph F. Johnston and George F. Maynard, Cabaniss & Johnston, Birmingham, Ala., William D. McLean, N. K. Sneed, III, and Henry L. Walker, Washington, D. C., and William S. Pritchard and Winston B. McCall, Birmingham, Ala., for plaintiffs.

Robert A. Bicks and James H. Durkin, Dept. of Justice, Washington, D. C., William L. Longshore, U. S. Atty., Birmingham, Ala., and, Robert W. Ginnane, Gen. Counsel, and C. H. Johns, Jr., Associate Gen. Counsel, I. C. C., Washington, D. C., for defendants.

E. L. All and David J. Vann, White, Bradley, Arant, All & Rose, Birmingham, Ala., A. Alvis Layne, Jr., Washington, D. C., D. H. Markstein, Jr., Markstein & Cooper, and W. J. Sullivan, Jr., Sadler, Sadler, Sullivan & Herring, Birmingham, Ala., for intervenors.

Before RIVES and TUTTLE, Circuit Judges, and LYNNE, District Judge.

LYNNE, District Judge.

Proceeding under the provisions of 28 U.S.C.A. §§ 1336, 1398, 2284, 2321–2325, 5 U.S.C.A. § 1009, and 49 U.S.C.A. § 17 (1), plaintiffs, Southern Railway Company (Southern), Georgia Industrial Realty Company (Realty Company), a wholly owned subsidiary of Southern, and Birmingham Food Terminal Corporation (Terminal Corporation) brought this action to enjoin or set aside the report and order of the Interstate Commerce Commission, dated October 6, 1959, in the Commission's Docket No. 32241, Shaw Warehouse Company vs. Southern Railway Company, et al. The report of the Commission is officially reported at 308 I.C.C. 609.[1]

The order complained of was entered in a proceeding commenced by the filing of the July 25, 1957, complaint of Shaw Warehouse Company (Shaw Company), in which proceeding the Bureau of Inquiry and Compliance of the Commission (Bureau of Inquiry), Birmingham Ice and Cold Storage Company (Birmingham Ice), Harris Transfer Company (Harris Transfer) and Harris Warehouse Company (Harris Warehouse), and the Louisville and Nashville Railroad Company intervened. Shaw Company, Birmingham Ice, Harris Transfer and Harris Warehouse also intervened as defendants herein pursuant to the provisions of 28 U.S.C.A. § 2323.

In the report and order here under attack, the Commission found that, in their leasing of the facilities known as the Birmingham Food Terminal (Terminal Facilities), Southern and its real estate development subsidiary, Realty Company, have violated the anti-concession prohibitions against undue and unreasonable discriminations, prejudices and advantages and against departures from, and the extension of privileges and facilities other than those specified in, the railroads' published tariffs [49 U.S. C.A. § 2, § 3(1), § 3(2) and § 6(7)].

Before both Commission and Court plaintiffs have consistently maintained that the Commission had no power to grant the relief requested by Shaw or any of the warehouse intervenors under the foregoing sections of the Interstate Commerce Act. They insist that this is so for the reasons that none of the warehouse intervenors is a shipper or re-

1. The Commission's order, not officially reported, is quoted herewith:
  "This proceeding being at issue upon complaint and answers on file, and having been duly heard and submitted by the parties, oral argument having been had, and full investigation of the matters and things involved having been made, and the Commission having, of the date hereof, made and filed a report containing its findings of fact and conclusions thereon, which report is hereby referred to and made a part hereof:
  "It is ordered, That the defendants named in the complaint, according as they participate, be, and they are hereby, noti-

fied and required to cease and desist, on or before December 21, 1959, and thereafter to abstain from the unlawful rental practices, described in the report made a part hereof, in connection with the operation of the Birmingham Food Terminal at Birmingham, Alabama.
  "It is further ordered, That said defendants, according as they participate, be, and they are hereby, notified and required to file with this Commission, in affidavit form, a statement of action taken to correct these practices on or before December 21, 1959.
  "And it is further ordered, That this order shall continue in force until the further order of the Commission."

ceiver of freight; that the railroad does not provide "a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions" for the warehouse intervenors and the tenants of Terminal Corporation so as to give rise to a prohibited discrimination under 49 U.S.C.A. § 2; that without such discrimination there can be no unlawful "preference" prohibited by 49 U.S.C.A. § 3(1), and that there can be no prohibited rebate within the meaning of 49 U.S. C.A. § 6(7) without a showing that facilities are provided a shipper on a non-compensatory basis.

■ Having performed its duty to canvass the whole record of the proceeding before the Commission in obedience to the command of the Administrative Procedure Act (5 U.S.C.A. § 1009), instructed by the teaching of Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, the Court, in a desire to compress its discussion of a voluminous and complex record within reasonable limits, will respond to plaintiffs' threshold contentions in the body of this opinion.

On the basis of specific findings that the rentals charged for the use of the railroad's facilities were substantially below those prevailing under established market practices, and that the railroad had followed a practice and pattern of delayed collection thereof, and of extending credit on freight bills beyond the the 96 hours allowed by the regulations of the Commission, it issued an order requiring plaintiffs to cease and desist from unlawful rental practices and to file with the Commission, in affidavit form, a statement of action which they have taken to correct such practices.[2]

The terminal facilities with which we are concerned came into existence as a result of a program initiated by Southern in 1954, designed to promote a produce terminal facility, shortly thereafter expanded into promotion of a fully integrated food wholesale, processing, and warehousing facility. Southern's study of the produce aspects of the project alone showed that if such facilities could be constructed at a location on the lines of Southern outside the reciprocal switching district of Birmingham, so as to assure exclusive rail sevice by Southern, it could expect to attract new freight revenues from its competitors, ranging up to five hundred thousand dollars per year.

Early in the promotion, Southern's vice president, F. H. Brown, instructed Joseph DeOreo,[3] a professional promoter who had come to Birmingham at Southern's request and who had become affiliated with a local farmers' cooperative, Jefferson County Truck Growers' Association (Truck Growers), to concentrate his efforts on the six largest produce receivers in the area. Brown took the position that if a substantial number of these could be obtained, circumstances and trade influences would force the others to come into the terminal that Southern proposed to build. He stated that holdouts would "have to follow suit or wither on the vine * * * they would have to join the parade or perish."

The development was facilitated by the incorporation of Terminal Corporation on February 10, 1955, as a nonprofit corporation with paid-in capital of only two thousand dollars. This company has occupied no office space or other premises, and has had no employees or paid officials. It was designed as a conduit through which business between

2. The original effective date of the order was December 21, 1959. This was later extended to March 8, 1960, to permit consideration of a motion for reconsideration, and, upon the filing of this action was further extended pending further order of the Commission. Only the findings with respect to rentals are attacked herein;

no complaint is made of the Commission's findings with respect to extensions of credit on rents and freight bills.

3. That DeOreo was no stranger to similar promotion efforts, see Union Pacific R. Co. v. United States, 1941, 313 U.S. 450, 61 S.Ct. 1064, 85 L.Ed. 1453.

Southern and occupants of the Terminal could be channeled.

As originally conceived the promotion plan contemplated that the necessary land would be conveyed by Realty Company to Terminal Corporation under a 4 percent second mortage on which interest would be payable annually, but no principal payments would be due during the twenty-five-year life of the mortgage. A construction loan would be obtained in the name of Terminal Corporation, which loan would be secured by a first mortgage on the same land and the facilities to be constructed thereon. The land and improvements, subject to these first and second mortgages, would be leased to Realty Company for twenty-five years at a rental equivalent to the principal and interest payments required under the first mortgage. This lease would then be assigned to the first mortgagor as collateral security. Thereafter, Realty Company would lease the same property back to Terminal Corporation for the same rental period and for substantially the same rent. Facilities constructed on portions of the property for the individual tenant-purchasers would then be sold to such tenant-purchasers, subject to the mortgages and leases described. As a condition of securing the first mortgage loan, an agreement would be executed between Southern and the first mortgagor guaranteeing the performance of all of the obligations assumed by Realty Company under its lease of the property from Terminal Corporation. This guarantee by Southern was designed and intended to permit the tenant-purchasers to purchase their individual facilities, each independent of the other, without being required to make any down payment on the purchase price and to secure for them the lowest possible interest rate by extending to them the use of Southern's credit with the lending agency. The purchase price itself was to be substantially reduced by reason of the fact that Southern, for itself, was to pay a substantial portion of the costs, and was to retain title to certain portions of the land devoted to the use of the terminal participants. For example, the purchase price would not include any of the substantial costs of grading the property, or any of the value of land devoted to service tracks or a large portion of the land devoted to driveway areas serving the terminal. Nor would it include any of the costs of paving such driveway areas or those portions of driveway areas which crossed service track areas retained by Southern. The purchase price, however, was to include the interest costs of interim financing required during the period of actual construction.

On September 26, 1955, Atlantic Coast Line and several other railroads filed a petition with the Interstate Commerce Commission seeking an investigation into the legality of such proposed sales plan. Southern thereupon modified its terminal plan on October 18, 1955, agreeing, through Realty Company, to undertake the construction of the facilities and to lease them to the proposed tenant-purchasers, under separate leases for each, for a period of five years with option in the tenants to renew for an additional five-year period. The separate leases were to be assigned to Realty Company. The lease agreement provided that if the original plan was determined by proper authorities, to the satisfaction of Southern, to be legally sound, both tenants and railroad would be obligated to carry out the sales agreement. In any event, the tenants were given an option to purchase the property at the cost price provided for in the original plan at any time during the potential ten-year term of the lease. The rental under this lease plan was set at 8 percent per year of the cost base represented by the sales price under the original plan, from which base Southern had agreed to exclude substantial costs. It was agreed that the total rental would be distributed among the tenants on the basis of the square feet occupied by their facilities and by the expansion areas adjacent thereto which most tenants had reserved.

Beginning in June, 1955, prior to the completion of the entire terminal facility, certain of the individual buildings were completed. Some of these were occupied, wholly or partially, as they became available. The earliest of such occupancies was that of a public cold and dry storage warehouse company, Thomas N. Nelson & Company (Nelson Company) on May 15, 1956. Until the entire terminal was declared officially completed on July 31, 1957, monthly rents were negotiated with individual tenants roughly on the basis of the costs expended and included in the rent base under the October, 1955, agreement, and of the portion of the property available for use by the tenants. In virtually all instances there were lags of several months in the billing and collection of these rentals. At the time of the hearing before the Commission on January 21, 1958, Nelson Company had paid rent for a period of only two months of its entire occupancy and was over $135,000 in arrears. It was charged no rent at all for the period May 15, through July 31, 1956. During the hearing before the Commission on February 27, 1958, Southern instituted an action against Nelson Company and Terminal Corporation for rent in the amount of $135,000 owed by Nelson Company. As of that date, all of the tenants of the Food Terminal were in arrears on their rent since September, 1957, in amounts aggregating, under the railroad's method of computing rents, over $335,000. The action against Terminal Corporation, however, included no effort to collect this rent and, although the president of Nelson Company had previously testified in the hearing that his company could not pay the rent due, and that during its entire period of occupancy it had never been in a position to pay the rents owed by it at any time, no effort was made by the railroad to evict the tenant.

The discontinuance of payment of rent by other tenants was said to stem from their unwillingness to pay rent in the amounts required under their October, 1955, lease agreement. By withholding rental payments, it appears that in January, 1958, they secured an agreement from the railroad to reduce the rents due under their leases by an aggregate amount of approximately $32,000 annually. This was accomplished through the agreement of Southern to remove from the cost-rental base the sum of $392,816.-06 which was required to be allocated under the October agreement to areas set aside for various tenants for future expansion. These costs were reallocated by Southern to these expansion areas and to building areas otherwise set aside for future tenants.

During the hearing before the Commission, several of the tenants testified, however, that they would pay the rents owing if the railroad would only send them a bill. One tenant testified that he had received from the railroad no demand for his rent and that he had stopped payment because he "could not see any point in us paying rent when other people were not paying rent." Several other witnesses testified that there had been no demand for payment but that they were willing to pay rent only if Southern would reduce the cost basis of their rent to a point satisfactory to them. Others testified that they would pay rent only if their right to purchase their building was clarified.

The evidence showed that the prevailing market practice in the Birmingham area for newly constructed commercial facilities, such as those in Southern's terminal, was to require a rental based on 8 percent of the value of land and 10 percent of all construction costs and all other expenses including incidentals such as architects' fees. However, such rental terms represented a minimum for national concerns with substantial financial standing, with ten to fifteen year term leases, where the buildings were of multi-purpose construction which would enable them easily and readily to be relet in the event of a lease cancellation or financial failure of the tenant. Where the lease is shorter, the financial standing questionable, where significant amounts of special equipment are included in the buildings, such as the refrigerated stor-

age space or smokehouses built into various of Southern's facilities, higher rents or longer term leases generally would be required.

■ Clearly, there is substantial evidence in the record showing that Southern's rental program, even if enforced to the letter of the October, 1955, agreement, did not measure up to prevailing market rental practices. The cost base employed by Southern did not include all of the costs of construction or all of the value of land.[4] The Commission found that land under spur tracks and in areas where its utilization is otherwise essential to the occupancy of the tenants was wrongfully excluded from the cost base. It likewise found that substantial costs for grading, construction of spur tracks, and promotion and engineering expenses were improperly excluded.[5] Southern used 8 percent as the rental factor on construction costs rather than the 10 percent factor under the prevailing market rental practice.

It should be emphasized that this court is not essaying the impermissible role of fact finder. However, in the discharge of its duty to canvass the whole record in arriving at a determination as to whether there is a rational basis for the ultimate conclusions of the Commission, we have deemed it appropriate to discuss facts which are supported by substantial evidence in the record. While the body of evidence opposed to the Commission's findings has been considered, to discuss it would be to prolong this opinion unduly.

■ The railroad rental practices condemned by the Commission are not novel. They are but variations of practices which have been uniformly condemned by the Commission and the courts under both the Interstate Commerce Act and its cognate statute, the Elkins Act, 49 U.S.C.A. §§ 41–43, which, for such purposes have been considered to be in *pari materia*. These statutes, remedial in nature, are "applicable to every method of dealing by a carrier by which the forbidden result could be brought about." New York, N. H. & H. R. Co. v. Interstate Commerce Commission, 1906, 200 U.S. 361, 26 S.Ct. 272, 277, 50 L.Ed. 515. Because of the indirect forbidden concessions which necessarily result from inadequate rentals for freight-producing facilities, railroads have in the past successfully invalidated their own lease agreements because of such rental arrangements. Cleveland C. C. & S. L. R. Co. v. Hirsch, 6 Cir., 1913, 204 F. 849; Central of Georgia R. Co. v. Blount, 5 Cir., 1917, 238 F. 292. In Leases and Grants by Carriers to Shippers, 73 I.C.C. 671, 683 (1922), the Commission announced as a general policy to be followed by all railroads that railroad-owned warehouses should not be leased on terms "less favorable than would be obtained, under similar conditions and restrictions of use, were the land owned independently of the railroad." And, in Propriety of Operating Practices—Packing Sheds, 246 I.C.C. 273, 286 (1941), the Commission specified that the commerce laws required that where new facilities are built, "the total rental should be not less than enough fully to cover a fair return on value plus taxes, insurance, depreciation and maintenance, and no such new construction should be undertaken unless there is assurance, with all reasonable certainty, that such rental can and will be collected."

Such railroad rental programs have been considered on two occasions by the Supreme Court. In Baltimore and Ohio R. Co. v. United States, 1939, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318, the

---

4. There was considerable evidence opposing the twenty-five hundred dollar per acre valuation of land, employed by Southern, but the Commission held that it could not say that such valuation was inadequate. 308 I.C.C. at 629.

5. The Commission held that Southern should not be required to include the costs of the lead track, certain spur tracks serving the nonshipping truck growers, tracks which it found conducive to use as team tracks, and the costs of demolishing old buildings and removing old tracks. 308 I.C.C. at 630. These findings were not challenged in this proceeding.

Court sustained an order of the Commission requiring various railroads operating and leasing warehouses in the New York City area to charge no less than fully compensatory rents. Such rents were ordered even though it appeared that rents thus required would be higher than prevailing market rents because the railroads had constructed so much more dry and cold storage warehouse space than was needed in the area that they had depressed the normal rates and rentals. The District Court had observed (20 F. Supp. 273, 278), "It is no answer to the violations of the statute to say that as the railroad has a losing piece of property on its hands which it acquired in good faith it should be permitted to rent it for its fair rental value. That is true only provided so doing does not violate the law. While it may lawfully minimize its losses from bad investments, it may not give concessions to a favored shipper." While the Supreme Court noted that where freight is not an object, and competitive practices are absent, reasonable or market value might be the proper test of such rents, it was clear in its conclusion that rents should not be less than compensatory where the facilities were furnished for the purpose of securing freight. The Court observed:

"* * * It is immaterial that the shipper pays fair value or the market price for the extra privilege he enjoys. Section 6(7) of the Act forbids the carrier to receive less than the published rates for transportation or to remit 'by any device any portion of the rates.' When services, not necessary for transportation, are furnished below cost in an effort to acquire rail transportation, as was done here, this provision is violated. Since the carrier warehouse rates, as found by the Court and Commission, are not open to all shippers alike there is violation of sections 2 and 3(1) prohibiting discrimination and unreasonable prejudice. The rail transportation rates have charged against them the loss occasioned by warehousing practices designed to attract a volume of rail business." 305 U.S. at pages 523–524, 59 S.Ct. at page 290.

Emerging from these cases is the clear rule that rents railroads charge for facilities leased for the purpose of attracting freight must be no less than the prevailing market rents in the area, and no less than compensatory, including the normal return on capital employed in like enterprises, whichever is higher. A carrier is prohibited from engaging in such noncarrier business on a more favorable basis than other business because it can offset any losses against carrier revenues. It cannot operate noncarrier business as a means of securing freight business free of the Commerce Act's required standards for carrier conduct.

The language in the Supreme Court opinion in Union Pacific R. Co. v. United States, 1941, 313 U.S. 450, at page 464, 61 S.Ct. 1064, 1076, 85 L.Ed. 1453, that rents there need not be compensatory is not inconsistent with this rule. There the railroad and the city of Kansas City, Kansas, jointly promoted a food terminal. The city provided the land and the Public Works Administration, a federal agency, furnished about 45 percent of the construction funds. Except for the participation of the railroad there would have been no commerce law restrictions on rental levels. But because of the railroad's participation it was held that rents must be no less than "fair rental value", even though such rent might not be compensatory on the investment of all of the joint participants in the financing. The Court prescribed a series of tests to be applied in determining the rents to be charged by the city under these circumstances. These were: (1) going rates for similar facilities in the community; (2) rents prospective tenants are willing to pay; (3) over-all cost and over-all value of the properties; (4) cost of furnishing the facilities, including the normal return on capital employed in like enterprises, and (5)

**38**

other pertinent factors which might emerge. Under Baltimore & Ohio, it was recognized that the Commission had the power "whenever it is of the opinion that any practice is unjust, unreasonable, preferential or otherwise violative of the Act, to prescribe what practice will be just, fair and reasonable." In this case the Commission found that the Union Pacific standards "may well be applied in this proceeding." In doing so, it found that "the basis upon which the assailed rents were constructed was and is unduly low by comparative standards, as is also the defendant carrier's return on its investment." It justifiably concluded that "little value can here be attached to the factor of the rentals that the tenants are willing to pay, for as shown, some of the tenants appear dissatisfied in varying degrees with the low rentals they are now paying." It found that the rents did not reflect overall costs and over-all value and were substantially below the prevailing practice which, after considering costs of furnishing the facilities, must provide the normal return on capital employed in like enterprises. Thus, the Commission logically concluded that even the special tests of Union Pacific were not met by Southern's practices.

Plaintiffs suggest that the Commission did not, as it should have, consider as "other pertinent factors" under Union Pacific tests: (1) the provision for purchase under the October, 1955, lease agreement; (2) alleged informal approval by the Commission of its 8 percent rent formula, and (3) the depressive effect on Birmingham market rents of the construction of their food terminal facilities. The record demonstrates that all of these factors were considered and rejected by the Commission.

As to the first of these proposed factors, Southern insists that in fixing its rental charges it was not required to take into account depreciation costs because, it contends, the tenants are obligated by the October, 1955, lease agreement to purchase the facilities at undepreciated cost. If this were true, and

if the landlord was not a railroad leasing freight producing facility, there would be some logic in this position since its 8 percent rent would treat all of the costs as not being subject to depreciation in the same manner as the prevailing market rental practice treats land. However, such a rental formula would be the equivalent of an agreement by the railroad to postpone part of the rent to a future date, resulting in an unlawful loan or extension of credit similar to the extension of credit on delayed rent collections condemned by the Commission. See Vandalia R. Co. v. United States, 7 Cir., 1915, 226 F. 713; United States v. Hocking Valley R. Co., D.C.N.D.Ohio 1911, 194 F. 234, affirmed 6 Cir., 1914, 210 F. 735, certiorari denied, 1914, 234 U.S. 757, 34 S.Ct. 675, 58 L.Ed. 1579; Propriety of Operating Practices-New York Warehousing, 216 I.C.C. 291 (1936), affirmed 220 I.C.C. 102 (1937) sustained, Baltimore & Ohio R. Co. v. United States, D.C.D.Md.1938, 20 F.Supp. 273, affirmed, 1939, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318.

Assuming, *arguendo*, that such agreement is enforceable as a matter of law, practical obstacles such as the low capitalization of Terminal Corporation and the insolvency of Nelson Company abound in the record. Moreover, the tenants can be required to purchase only under the financing plan whereby Southern's property and credit are substituted for that of the tenants to obtain the purchase funds. This financing plan, with its otherwise unsecured second mortgage, and its first mortgage which is fortified by the additional security of Southern's full guarantee of the obligations of Terminal Corporation and the separate obligations of each tenant, is merely a more complex form of credit extension such as those condemned in Vandalia R. Co., supra; Hocking Valley R. Co., supra; and, Propriety of Operating Practices—New York Warehousing, supra. Cf. Section 20a of the Interstate Commerce Act [49 U.S.C.A. § 20a]; Texas and R. R. Co.—Assumption of Obligation, 271 I.C.C. 230 (1948); Lehigh

Valley R. Co.—Conditional Sales Contract, 233 I.C.C. 359 (1939). The Commission did not pass upon the validity of the sale plan; consequently, it is not before this court on review. However, in view of the fact that the cost-price under the sales plan excludes the very cost which the Commission held could not be lawfully excluded from the rent base, we fail to see how Southern can here complain of the action of the Commission in adopting a rental plan which requires the application of a higher rental factor to depreciable items of cost.

Southern further contends that the Commission should have sustained its 8 percent rent formula because of certain informal communications with Commission personnel. Following the filing of the Atlantic Coast Line R. Company petition for investigation in September, 1955, the Commission ordered the Bureau of Inquiry to investigate Southern's proposed food terminals at Birmingham and other cities along its lines to determine whether criminal prosecutions under the Elkins Act in one or more cities were indicated. In November, 1955, Southern wrote a letter to the Commission's chief examiner stating that until its sale plan was determined to be legal, it had adopted a rental plan in Birmingham. Under such plan Southern represented that the rents would be based on 8 percent of *full costs*. In May, 1956, the attorney for Terminal Corporation had an *ex parte* conference with a member of the Commission wherein the attorney states, in affidavits attached to the petition for reconsideration filed with the Commission, that he was given oral assurances that Southern's 8 percent rental program had the Commission's approval. On May 3, 1956, the Director of the Bureau wrote a letter to a member of the Congress stating that the Bureau's Birmingham investigation had been completed and on the basis of its report the Commission had decided not to recommend prosecution. Such letter stated, "The Bureau's investigation disclosed that under its present plan, the Southern Railway is constructing the terminal at its own ex

pense, retaining ownership thereof, and will lease at an annual rental equivalent to 8 percent of the value of the land and the cost of construction of the buildings and all expenditures in connection therewith. Upon the facts disclosed, the Commission did not find that the rental would be inadequate."

■ Complaining that the Commission erred in refusing to admit evidence of these informal advices, Southern is here insisting that they constituted at least some evidence of proper rents in Birmingham. We do not agree. The Commission did consider the letter of May 3, 1956. It found, "This was an informal opinion of the indicated official based on an informal investigation made prior to the construction of the terminal and hence without the benefit of the actual costs later incurred thereon. Thus it clearly had no evidentiary value and was properly rejected." Such letter indicated no more than an opinion that there would be no criminal prosecution. It did not represent or purport to constitute an approval by the Commission. It was neither the equivalent of a declaratory order issued by the Commission after public hearings under Section 5(d), The Administrative Procedure Act [5 U.S.C.A. § 1004(d)], nor an order of the Commission under Section 20a of the Interstate Commerce Act upon an application for Commission approval of financing arrangements.

■ *A fortiori*, the Commission properly disregarded evidence of informal oral advice given to the attorney for Terminal Corporation. The rights of parties, including intervenors, to the proceeding then pending before the Commission involving the legality of the rental arrangements would have been unduly prejudiced in their claims to the protection of the Commerce Act by the reception of evidence pertaining to oral *ex parte* assurances.

■ With respect to the contention that the Commission did not consider the possibility of a depressive effect on Birmingham market rents of Southern's

construction of the warehouse facilities involved herein, it is apparent that the Commission did consider this argument. Commissioner Webb based his dissent upon it. 308 I.C.C. 640. But we are of the opinion that under the teaching of Baltimore & Ohio R. Co., a railroad cannot justify its charging of lower rents because of the depressive effect upon pre-existing market rentals of its action in constructing facilities to be rented at a substantially lower rental.

■■■■ Upon our review of the record in this case, we find that the Commission's conclusions and findings are supported by substantial evidence. On the issues raised, even if we disagreed with the Commission, we would not be free to overturn its decision. Where an order of the Interstate Commerce Commission is attacked as being contrary to the evidence, the judicial function in this respect is exhausted when there is found to be a rational basis for the conclusions of the Commission. Mississippi Valley Barge Line Co. v. United States, 1934, 292 U.S. 282, 287, 54 S.Ct. 692, 78 L.Ed. 1260. The complaint admits that there was testimony to support the Commission's findings with respect to Birmingham rental practices although plantiffs attack the credibility of such testimony. But it is the task of the Commission and not of the courts to pass upon the weight and credibility of the evidence. Moreover, there is a presumption that the Commission has properly performed its official duties and this presumption supports its acts in absence of clear evidence to the contrary. See, American Trucking Ass'n v. United States, D.C. N.D.Ala.1951, 101 F.Supp. 710, affirmed, 1953, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337.

■■■■ Plaintiffs insist that the Commission's requirement that the railroad include in the rental base the cost of spur tracks designed to service the individual facilities of the terminal is a taking of its property without due process of law. The record supports no such conclusion. Southern is not required to surrender the normal and usual control over such tracks; it is merely required to include their cost in the costs upon which rentals are based just as any other landlord would do if it provided such facilities.

Plantiffs further contend that they were prejudiced by the participation of the Commission's Bureau of Inquiry and Compliance in the proceeding. The record discloses that the Bureau intervened pursuant to open petition without objection from plaintiffs. Such intervention was actually used by Southern to obviate the necessity of its responding to a subpoena duces tecum through which it might well have been required to produce documentary evidence. Moreover, such interventions are a part of the general duties of the Bureau.[6]

■■■■ As stated in its report, "The Commission is the guardian of the general public interest and proceedings before it are not in the nature of private litigation but matters of public concern in which the whole body of shippers and carriers is interested. Phillips Co. v. Grand Trunk W. Ry. Co., 236 U.S. 662 [35 S.Ct. 444, 59 L.Ed. 774]; United States v. Merchants & Mfrs. Traffic Asso. of Sacramento, 242 U.S. 178, 188 [37 S.Ct. 24, 61 L.Ed. 233]; Jewelers Pro-

6. A description of the Bureau and the duties assigned it have been published pursuant to 49 U.S.C.A. § 17 and 5 U.S. C.A. § 1002(a) (1), at 23 Federal Register 2654: Bureau of Inquiry and Compliance—Investigates violations, prosecutes in court and assists the Department of Justice in prosecuting civil and criminal proceedings arising under all parts of the Act (except violations of the safety acts which are under the jurisdiction of the Section of Railroad Safety, Bureau of Safety and Service), and related acts such as the Elkins Act, the Clayton Anti-Trust Act, 15 U.S.C.A. § 12 et seq., and the Transportation of Explosives Act, 18 U.S.C.A. §§ 831–835. When specifically authorized by the Commission or a division thereof in any particular case or class of cases, participates in Commission proceedings, for the purpose of developing facts and issues.

tective Union v. Pennsylvania R. Co., 36 I.C.C. 71." 308 I.C.C. 611. It is altogether proper that specially trained agency staff members participate in proceedings of general interest to shippers and carriers, such as that instituted by the Shaw Company complaint. Viewed from the standpoint of due process, it is preferable that such participation be open and public where the interested parties can meet the issues raised by it, rather than by internal administrative memoranda which interested parties have no opportunity to study or contradict. Such open participation by a clearly separate administrative arm of the agency such as that complained of here violates neither the letter nor the spirit of the Administrative Procedure Act. See Section 5(c). [5 U.S.C.A. § 1004(c)] The participation by the Bureau of which complaint is made here was in proper aid of the Commission's duty under Section 13(1) of the Interstate Commerce Act, 49 U.S.C.A. § 13(1) "to investigate the matters complained of in such manner and by such means as it shall deem proper."

We do not agree with plaintiffs that the Commission disqualified itself from acting on the Shaw Company complaint when it authorized the Department of Justice to file a civil action in this court seeking an injunction to prevent the consummation of the sale plan and to avert its continuing failure to collect rents. Civil Action No. 9155, United States v. Southern Railway Co., et al. That action resulted in an agreement by the railroad to maintain the *status quo* with respect to the sale plan pending a determination of the issue of its validity in the Commission proceeding.[7] Moreover, the Commission has a

duty under Section 3 of the Elkins Act (49 U.S.C.A. § 43) whenever it has "reasonable ground for belief that any common carrier is committing any discrimination forbidden by law" to request the Department of Justice to institute such proceedings. That section provides that "the proceedings provided for by this Act shall not preclude" any other action provided by the Commerce Act.

Nor can the judgments entered in this court on the verdict of a jury against Shaw Company, Birmingham Ice, and Boggs Cold Storage Company, in their suits for damages be *res judicata* of the Commission order, as plaintiffs contend. Those judgments are now pending an appeal in the Court of Appeals for the Fifth Circuit, but regardless of the outcome of such appeals, the appropriate conditions for application of the doctrine of *res judicata* are not present. The parties are not even the same. The success or failure of private litigation cannot have the effect to bar or stay the power of the Commission to act in a public proceeding such as that before the Commission under the Shaw Company complaint. See Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209. Furthermore, although such judgments were entered in June, 1959, over six months prior to the Commission's decision and order, no claim of *res judicata* was made before the Commission and none was included in plaintiffs' petition for reconsideration filed in November, 1959. Since the issue was not presented to the agency, it cannot properly be raised in this proceeding. United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54.

---

7. On August 28, 1958, Southern and Realty Company moved to dismiss the complaint of Shaw Company upon the filing of Civil Action 9155. The Commission overruled this motion by order dated October 29, 1958, stating "that the injunction proceeding filed in the United States District Court for the Northern District of Alabama (Southern Division) does not prejudice the issues in this proceeding, and that the said injunction proceeding is being held in abeyance pending a determination by the Commission of the issues in this proceeding." However, the Commission refused to rule on the validity of the sale plan because it considered that such action would be "manifestly premature." 308 I.C.C. at 616.

In support of their threshold contention that complainant warehouse had no standing before the Commission to challenge Southern's conduct, plaintiffs rely on the cases of Pittwood v. Northern Pacific R. Co., 51 I.C.C. 535 (1918), and Fireproof Storage Co. v. Hines, D.C. Wash.1919, 26 F. 215. The holding in these cases was that the mere owner of property capable of being used as a warehouse on a railroad had no standing to complain of railroad rental practices affecting the value of his property. Neither case was appealed and the result reached in each of them may be inconsistent with the Supreme Court's apparent holding in Barringer & Co. v. United States, 1943, 319 U.S. 1, 13, 63 S.Ct. 967, 87 L.Ed. 1171, that the protection of Section 3(1) of the Act extends to every person affected by violations of its prohibitions regardless of his relationship to transportation. However, we do not need to meet that question since it appears that the Commission actually applied the doctrine of Pittwood and Fireproof Storage to warehouse operators in McCormick Warehouse Co. v. Pennsylvania R. Co., 95 I.C.C. 301 (1925), only to reverse its position on rehearing in the same case. 148 I.C.C. 299 (1928). The Commission there decided that warehouses are so closely connected with transportation that they are the actual shippers and receivers of freight for their customers, although the warehouses often neither own nor pay the cost of the freight, nor appear as parties to the bill of lading. As such they, like freight forwarders, have the status of shippers and receivers of freight under the Commerce Act. This holding was affirmed in Terminal Warehouse Co. of Baltimore City v. United States, D.C.Md.1929, 31 F.2d 951, 957. This position has been sanctioned by the Supreme Court in such cases as Merchants Warehouse Co. v. United States, 1931, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227, affirming D.C.E.D.Pa.

1930, 44 F.2d 379, sustaining Gallagher v. Pennsylvania R. Co., 160 I.C.C. 563 (1929); Terminal Warehouse Co. v. Pennsylvania R. Co., 1936, 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827, affirming 3 Cir., 1935, 78 F.2d 591, overruling D.C. E.D.Pa.1934, 7 F.Supp. 484. See also Propriety of Operating Practices—New York Warehousing, supra. Moreover, Section 13(1) of the Interstate Commerce Act appears to say that "any person" can file a complaint. This was interpreted in Merchants Warehouse Co. as follows:

> "The warehouse companies are 'persons' authorized to lodge a complaint with the Commission by § 13(1) of the Interstate Commerce Act (49 U.S.C.A. § 13(1), and they are 'persons' within the meaning of that word as used in sections 2 and 3 of the act." (283 U.S. at page 512, 51 S.Ct. at page 509.)

Finally, plaintiffs complain that the order requiring them to base their rents on the prevailing market practice in Birmingham in 1955, viz., 8 percent of land value and 10 percent of all costs except those which they are expressly authorized to exclude, is fatally vague. The claim of vagueness is based primarily on the fact that the exact amount of certain of these costs was not established before the Commission; only their existence and substantial nature were shown. However, the railroad obviously is in a position to establish the exact amount of these costs and the Commission's order properly places the onus on Southern to establish the full and true amount thereof by the filing of sworn affidavits setting out all such costs.

It follows that plaintiffs are not entitled to the relief for which they pray and that this action is due to be dismissed. An order of dismissal will be prepared and entered.