SHAW WAREHOUSE COMPANY, Birmingham Ice and Cold Storage Company, and Boggs Cold Storage Company, Appellants,

v.

SOUTHERN RAILWAY COMPANY et al., Appellees.

No. 18138.

United States Court of Appeals
Fifth Circuit.

Sept. 29, 1961.

E. L. All, David J. Vann, D. H. Markstein, Jr., Birmingham, Ala., A. Alvis Layne, Jr., Washington, D. C., Francis H. Hare, Birmingham, Ala., for appellants.

Jos. F. Johnston, William S. Pritchard, L. Drew Redden, Birmingham, Ala., William D. McLean, Washington, D. C., Leigh M. Clark, Birmingham, Ala., for appellees.

Before HUTCHESON, BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The Court has considered carefully the appellants' application for a rehearing.

I.

The appellant warehouse companies argue that there is a direct conflict in statutory construction between this Court's opinion in the instant case, 288 F.2d 759, and the opinion of the three-judge court in Southern Railway Co. v. United States, D.C., 186 F.Supp. 29. The latter decision affirmed the ruling of the Interstate Commerce Commission that Southern's rental practices at the Birmingham Food Terminal were unlawful under Sections 2, 3(1) and 6(7) of the Commerce Act, 49 U.S.C.A. §§ 2, 3(1), 6(7). While the Commission's decision was not reached until after the trial below, both the Commission's decision and the appeal taken by Southern became final before this appeal was decided. Appellants contend that the three-judge court, speaking through Judge Seybourn Lynne, decided the major issues in this appeal and that this Court's decision creates irreconcilable conflicts in the law applicable to the Birmingham Food Terminal.

The Commission stated in its opinion in Shaw Warehouse Co. v. Southern Railway Co., 308 I.C.C. 602, 611 (1959): "The Commission is the guardian of the general public interest, and proceedings before it are not in the nature of private litigation, but are matters of public concern in which the whole body of shippers and carriers is interested." In the three-judge case Southern Railway contended that the judgments entered in the instant suit, then pending on appeal, were res judicata of the Commission's order. Judge Lynne, for the court, held: "[R]egardless of the outcome of such appeals, the appropriate conditions for application of the doctrine of res judicata are not present. The parties are not even the same. The success or failure of private litigation cannot have the effect to bar or stay the power of the Commission to act in a public proceeding such as that before the Commission under the Shaw Company complaint. See Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209." Southern Railway Company v. United States, 1960, 186 F.Supp. 29, 41.

 Judge Lynne was thoroughly familiar with the litigation and any possible conflicts. He was the district judge who presided at the trial of this case below. At that time he had the full benefit of the Commission's lengthy opinion. Proceedings before a public agency and proceedings in a private suit for damages are different in objectives, breadth of approach, and issues. Not the construction of the Commerce Act but the application of the Act is different. Once over the hurdle of the motions to dismiss, this case was a factual one for the jury to decide. The jury had before it considerable evidence not contained in record of the Commission's proceedings. And, the important questions of causation and in-

jury, which may have been crucial in the minds of the jurors, were not present in the I.C.C. proceedings.

■ Shaw Warehouse Company initiated the proceeding before the Commission; Boggs Cold Storage Company and Birmingham Ice and Cold Storage Company intervened. Under the Act, the warehouse companies could seek damages and other relief from the Commission. Instead, they elected to sue for damages in the district court. The jury held against them in that forum. We are still unimpressed with the argument that we should reverse the verdict in the forum below on the strength of a finding in a different kind of proceeding in another forum.

In the original briefs appellants argued that "the regulatory agency decision should be given special weight in these appeals." At that time the three-judge case had not been decided. We have given "great weight" to the opinions of the Commission and Judge Lynne. Still we must decide this case on the record before us and in the light of the law as we read it.

## II.

Judge Lynne, the hero of appellants first argument, is, along with this Court, the villian of their second argument: that the trial judge erred in allowing counsel for the Southern Railway to engage in prejudicial remarks and cross-examination allegedly picturing Southern Railway as the friend and champion of the poor and defenseless against the warehouse companies, rich and powerful exploiters of the less fortunate. This argument, first made with some moderation on behalf of all the appellants in the original hearing, is now urged only by counsel for Shaw Warehouse Company and Boggs Cold Storage Company in a supplemental petition and brief on rehearing.

■ Another reading of the record confirms our view that Judge Lynne did not abuse his discretion as a trial judge in controlling the attorneys' argument and cross-examination. Judge Lynne is an able, experienced district judge whose record is beyond criticism. After the trial below, when he attempted to rescue himself from serving on the three-judge court, by agreement of all of the parties he consented to serve.

■ As stated in our original opinion, we do not endorse improper arguments, such as the allusions to Marie Antoinette, but we find no reversible error. It is hard to say which litigant is the pot and when it started calling the kettle black. Southern says, for example, that counsel for Boggs and Birmingham Cold Storage was the first to make the housewife an issue. Considering the length of the trial and the intensity of the feelings engendered by the trial and events preceding it, we think that the lapses were relatively few; their probable effect must be weighed against the total effect of the case on the jury. The record as a whole reflects great credit on the ability and judgment of the district court in keeping the lawyers within the bounds of propriety.

## III.

The application for rehearing raises points of law the Court considered in the writing of the original opinion. One of these points, however, should be clarified.

■ Appellants contend that the Court makes a warehouseman's status as a shipper an issue of fact when it is an issue of law. Appellants over-simplify the question in stating it in terms of a warehouse company being a "person" within the meaning of Sections 2, 3(1) and 6(7) of the Commerce Act and of a warehouseman being a "shipper" as a matter of law. As pointed out in the opinion, there is no doubt that warehouse companies are persons within the Act and that they have standing before the Commission as shippers. What they must prove in an action to recover damages is a different matter. The Commerce Act has reached the ripe old age of seventy-five years. During that time there has been only one action for damages comparable to the instant case. Pittwood v. Northern Pacific Ry. Co.,

1918, 51 I.C.C. 535. In Pittwood the Commission held: "A warehouse owner, a landlord seeking to rent his property, as such, has no relation with a common carrier which could result in a discrimination against him in violation of the act to regulate commerce. The discrimination there forbidden is in respect of transportation."

We said in our opinion that Pittwood might be distinguished on the ground: "In Pittwood the injury was to a landowner whose real estate investment depreciated in value; the injury was not the result of discrimination with relation to transportation." Judge Lynne made the same distinction in Southern Railway v. United States, 1960, 186 F.Supp. 29, 42, indicating thereby that he too considered that not every warehouseman must be treated as a shipper. The discrimination must relate to transportation. Here, if the evidence had shown beyond a reasonable doubt that the appellants were in fact complaining only because the advent of a competitor had produced a decline in rental value of warehousing property in downtown Birmingham, and not because of a discrimination relating to transportation, we would have held that the court erred in not directing a verdict for Southern.

■ The trial judge did not present this issue to the jury, perhaps because, as appellants suggest, he considered that the matter was settled as one of law. We consider the question essentially a factual one or a mixed question of fact and law. In any event, the trial judge properly overruled appellee's motions to dismiss and for a directed verdict and appellants have no cause for complaint.

We have considered all of the other points raised in the briefs on rehearing. We find it unnecessary to discuss these points. The petition for rehearing is
Denied.

1. The 3-Judge Court, affirming the ICC Order, was composed of Circuit Judges TUTTLE and RIVES and District Judge LYNNE. Southern Railway Company v.

JOHN R. BROWN, Circuit Judge (dissenting).

The Petition for Rehearing and more mature reflection convince me that our prior decision was wrong. I must therefore dissent from a refusal to reverse this judgment.

I do it on the fundamental basis that two courts, both within this Circuit, and, as it now turns out, composed of a like number of Circuit Judges of this Circuit,[1] have reached diametrically opposite results on several identical, critical issues.

Of course I am not so naive as to think, or even hope that, in today's multi-partied, multi-state, multi-forum litigation there must always be symmetry and uniformity. But this is no railroad crossing accident case in which each of three injured passengers, each with his own separate suit, must take the risk that as many different juries will reach a like number of results and which, all the while, leaves the railroad in bewilderment as to just what it would have taken to satisfy the plaintiffs and the juries in how the train ought to have been run.

Here we have one railroad. We have one cold storage terminal. We have one group of competitor complainants. We have one undisputed lease arrangement evidenced by one set of writings between railroad and tenants. We have one rental basis producing one rental figure. We have the identical nonpayment of rent by the tenants and identical inaction by the railroad in the effective collection of rent or eviction of delinquent tenants. More than that, we have a single statutory policy condemning any type or kind of discriminatory rebate or favoritism by a railroad.

Yet this single railroad is authoritatively told by two parallel tribunals that this single lease is (1) illegal and must be terminated because (a) the rental

United States, D.C.N.D.Ala., 1960, 186 F.Supp. 29. In view of my dissent, my Brothers HUTCHESON and WISDOM likewise number two.

basis is inadequate and (b) the rents have not been diligently collected; but also that (2) a jury is entitled to determine whether (a) the rental basis is inadequate or (b) rents have been diligently collected.

No one but a lawyer, or lawyer-turned judge, could begin to understand how this could be. And, I submit, it is even too much for the legal mind which has, to be sure, been affected by its preoccupying fetish with the run-of-the-mill notion of every suit as a "separate controversy." When dealing with such matters of transcendent public importance as this one case—in two forums—presents, this approach is a luxury which we can ill afford. That it poses some troublesome conceptual phases and cannot, for example, be readily disposed of on traditional notions of res judicata, collateral estoppel, or the like,[2] does not justify either the result or the despair that, bad as the result is, there is nothing that can be done about it so long as we follow a system that each case stands on its own —not only stands on its own but ends in divergent results since each tribunal must determine for itself what is the law and what it is that the law compels.

Before briefly pointing out some of these specific but critical divergencies, I should make clear that I accept the proposition that the suit for damages is different from the administrative ICC proceeding. It is different precisely in that the plaintiffs have a right of recovery only for *damage* sustained by reason of violations of §§ 2, 3(1) and 6(7) of the Interstate Commerce Act. 49 U.S. C.A. §§ 2, 3(1), 6(7). But this single factor does not, as the Court repeatedly emphasizes, purge the trial of its errors or those which we compound of our own.[3] This is so because this case was submitted on a general verdict which left the precise basis for jury action as an "enigma wrapped in a mystery." Had the trial court, as we have many times suggested in these complex situations,[4] resorted to a general charge with special interrogatories under F.R.Civ.P. 49(b), 28 U.S.C.A., all of this would have been sufficiently exposed. Had that been done we could then have measured whether any assumed specific answer to the damage issue[5] or to the other two issues

2. The 3–Judge case, decided while the appeal was pending undetermined by us, rejected the Railroad's contention that its jury verdict victory in the damage suit was res judicata as to the ICC order. 186 F.Supp. 41.

 We returned the compliment when we rejected a similar contention by the damage suit plaintiffs that affirmance of the ICC order was a binding declaration of illegal practices by the Railroad, 288 F. 2d 761, note 5.

3. For example, the Court, rejecting res judicata, in note 5 states:

 " * * * The issues of causation and injury present in this case were not present in the I. C. C. proceedings. * * * The jury may have found that Southern violated the Act, but that the violations caused no injury to the defendants. There is no necessary inconsistentcy, therefore, between the jury's finding and the Commission's finding. * * *" 288 F.2d 761–762.

 Then, wiping out all theretofore stated, the Court disposes of the whole case on the damage issue. "Even assuming that the defendants violated the Act, the rec-

ord supports the verdict on the basis that Shaw failed to prove any injury and that none of the plaintiffs successfully carried the burden of proving that the defendants' violations of the Act caused the plaintiffs' business losses." 288 F.2d 776.

4. Vickers v. Tumey, 5 Cir., 1961, 290 F. 2d 426, 432 note 4, 435 note 9; Travelers Ins. Co. v. Busy Electric Co., 5 Cir., 1961, 294 F.2d 139; Warren Petroleum Co. v. Thomasson, 5 Cir., 1959, 268 F. 2d 5, 9 note 3; Clegg v. Hardware Mutual Casualty Co., 5 Cir., 1959, 264 F.2d 152.

5. Since the Court finally falls back to this as the positive assurance of correctness of its decision of affirmance, I think it appropriate to point out as a collateral recantation that this business of damages was handled in a strange way. By pretrial order the question of the *amount* of damages was expressly excluded from the trial. How careful, but conscientious, counsel were to comply with this order and yet at the same time carry the burden of showing in a monetary way that, in the words of the judge's jury charge,

was supportable in the evidence or erroneous in the instruction.

But as it was, the jury returned simply a general verdict for the Railroad. Whether it was on the basis of no damage, or on the basis of adequate rental, or diligent collection no one now or ever will know. But because it is all enveloped in this sometime desirable juridical fog, the rule of law is that, if an important jury charge turns out to have been erroneous (and properly excepted to), the whole verdict is infected and falls. The law, unable ever to solve the riddle in fact, has to assume that it was the erroneous charge which induced the verdict. Consequently, if the Court's charge erroneously submitted either one or both of the issues of (a) adequacy of the rental base or (b) diligence of collection of rent, the verdict may not stand notwithstanding the issue of damages.[6]

This brings me then briefly to some of the divergencies. In dealing with them I need not undertake to elucidate on which of the two answers is correct. Only one is right. Both may not possibly be the law simultaneously. And yet, so far, they are.

The rental basis was attacked as inadequate on several grounds, three of which were substantial: (1) it did not include depreciation, (2) it did not include substantial costs for specific items,[7] and (3), the use of 8% rather than 10% as the factor on the cost of improvements.

The Railroad contended that depreciation should not be included in the cost base because, under the "Round Robin Agreement," if and when it could legally be done, the Railroad and tenants were bound to carry out the initial agreement by which the tenants were to purchase

the property. It is undisputed that the Railroad " * * * did not work depreciation into the rents * * * because the original agreement * * * was that the property * * * would be purchased at undepreciated cost, the rentals paid in the interim not to be credited to the purchase price." 288 F.2d 771. It is also undisputed that this item in terms of money was of substantial significance either as a factor in determining the rate of return (8% or 10%) or as an item in the cost base to which either rate would be applied.

What did the Interstate Commerce Commission—the principal guardian of the public interest in effectuating the lofty aims of the Transportation Act of 1940, 49 U.S.C.A. § 1 et seq.,—do with this contention of the Railroad? This was flatly rejected by the Commission. And this was expressly affirmed by the 3-Judge Court. After conceding a certain logical plausibility to the argument were the landlord one other than a common carrier leasing a "freight producing facility," the Court condemned it outright:

"However, such a rental formula would be the equivalent of an agreement by the railroad to postpone part of the rent to a future date, resulting in an unlawful loan or extension of credit similar to the extension of credit on delayed rent collections condemned by the Commission. * * * [citing cases]." 186 F.Supp. 38.

The 3-Judge Court then proceeded to point out that the so-called repurchase agreement—asserted as an excuse for exclusion of a depreciation factor—required the tenants " * * * to purchase only under the financing plan

" ' * * * at least some injury or damage resulted to each plaintiff as a result of a violation' of the Act," 288 F.2d 777, has never been made clear to me.

6. Of course the matter would be different were the Court to determine as a matter of law that damages were not shown. We declined to do this and held it was for the jury. 288 F.2d 776–777.

7. These aggregated, on plaintiff's contentions, over $952,000. The items were tabulated in note 9 of the Court's opinion, 288 F.2d 765. The three items of Grading, Tracks and Interest Cost total over $800,000.

The 3-Judge Court dealt with this at 186 F.Supp. 36, and notes 4 and 5.

856

whereby Southern's property and credit are substituted for that of the tenants to obtain the purchase funds." 186 F. Supp. 38. The Court continued: "This financing plan, with its otherwise unsecured second mortgage, and its first mortgage which is fortified by the additional security of Southern's full guarantee of the obligations of Terminal Corporation and the separate obligations of each tenant, is merely a more complex form of credit extension such as those condemned in Vandalia R. Co., supra; Hocking Valley R. Co., supra; and Propriety of Operating Practices—New York Warehousing, supra * * *," 186 F.Supp. 38.

In short, the ICC and the 3–Judge Court held categorically that notwithstanding the potential purchase of the properties by the tenants at an undepreciated figure at an uncertain time in the future, depreciation had to be taken into account because, even on that assumption, it was an unlawful extension of the Railroad's credit for that period of time.

And what did we do to that standard? By affirming the trial judge's charge that the jury need not consider depreciation if it found that Southern and the tenants intended at all times to revert to the original purchase sales plan, this Court rejected outright the standard of conduct exacted by the ICC. What the Court described as the "plaintiff's theory" [8] was actually a paraphrase of the words of the 3-Judge Court quoted above. In rejecting the plaintiff's theory, we rejected the legal standard adopted by the Commission and affirmed by the 3-Judge Court.

As to this contention of the plaintiffs and the flat holding of the ICC and the 3-Judge Court, we merely acknowledged

that the "argument carries a little aroma of plausibility." We then rejected it out of hand since it would " * * * allow Southern to recover the depreciation twice, once in the sale and a second time by including the element of depreciation in computing the cost-base for rentals." 288 F.2d 772.

The same thing happened as to the exclusion of specific substantial items in the cost base. See note 7, supra. The ICC and the 3-Judge Court held that some of these identical items had not been included adequately in the cost base.[9] The 3-Judge Court made it very plain:

"The cost base employed by Southern did not include all of the costs of construction * * *. The Commission found that land under spur tracks and in areas where its utilization is otherwise essential to the occupancy of the tenants was wrongfully excluded from the cost base. It likewise found that substantial costs for grading, construction of spur tracks, and promotion and engineering expenses were improperly excluded. Southern used 8 percent as the rental factor on construction costs rather than the 10 percent factor under the prevailing market rental practice." 186 F.Supp. 36.

The 3-Judge Court then characterized this matter in terms which epitomized a century's history: These " * * * railroad rental practices condemned by the Commission are not novel. They are but variations of practices which have been uniformly condemned by the Commission and the courts * * *," 186 F. Supp. 36. It was in such sweeping words that the 3-Judge Court affirmed the ICC order which ordered the Railroad to "cease and desist * * * and there-

8. This Court's opinion states:
"The plaintiffs' theory is that the charge was erroneous, even if eventually the property would be purchased at the undepreciated cost, because the rent would result in the indirect loan, without interest, of the depreciation—until the sale occurred. As a result, they argue,

the carrier unlawfully furnished working capital to the tenants." 288 F.2d 772.

9. The intrinsic merits of each item has been carefully considered by the ICC. See notes 4 and 5, 186 F.Supp. 36 which indicate some of the items on which the ICC agreed with the Railroad.

after * * * abstain from the unlawful rental practices * * * "[10] and required the Railroad to file record proof of its compliance.

Bearing in mind that there was but one terminal facility constructed and these items of disputed cost were identical in both proceedings, what rule of law did this Court lay down? Whereas the ICC held that the leases could no longer subsist and that the Railroad would have to take affirmative action to terminate them, we held that it was for the jury to say whether the leases were or were not valid because these items were or were not properly included in the cost base. The strong public policy effectuated by the ICC order was left to the jury of untrained persons to determine both fact and the relative importance of legal factors. We said in the broadest terms:

"In final analysis the propriety of Southern's including these items in fixing rentals and the weight to be attached to any one or more of these items were questions for the jury." 288 F.2d 773.

Moreover, as to both of the elements of (a) depreciation and (b) exclusion of specific items, there was a further decisive divergence. It assumes central importance since, as to both, this Court left it to the jury to make the determination. The standard of measuring adequacy of the rent was succinctly declared by us:

"We consider that fair rental value, that is, 'fair market rent', rather than a compensatory return is the proper standard, at least in this type of action, because the suit rests on a claim for damages caused by destructive competition." 288 F.2d 772.

By rejecting the requirement that the rental produce a "compensatory return," we then held that considering general real estate conditions in Birmingham "the jury could have concluded that the plaintiffs failed to show that it was economically feasible for Southern * * * to obtain tenants willing to pay rent that would yield ten per cent on warehouse buildings * * *." 288 F.2d 772.

Contrast this with the standard set by the ICC and declared by the 3-Judge Court in these emphatic terms:

"Emerging from these cases is the clear rule that rents railroads charge for facilities leased for the purpose of attracting freight must be no less than the prevailing market rents in the area,[11] and no less than compensatory, including the normal return on capital employed in like enterprises, whichever is higher. A carrier is prohibited from engaging in such noncarrier business on a more favorable basis than other business because it can offset any losses against carrier revenues. It cannot operate noncarrier business as a means of securing freight business free of the Commerce Act's required standards for carrier conduct." 186 F.Supp. 37.

Where we had held that the "jury could have concluded * * *" that it was not "economically feasible" for the Railroad to obtain tenants on a rental that would produce a fair return on actual costs, 288 F.2d 772, the 3-Judge Court applied strong words in expressly rejecting the Railroad's contention that the rental should take into account "the depressive effect on Birmingham market rents of the construction of their food terminal facilities." 186 F.Supp. 38.[12]

10. See note 1, 186 F.Supp. 32.

11. We had earlier quoted so much of Judge LYNNE'S opinion down to this point. 288 F.2d 770. The effect was to omit altogether the comparative standard of prevailing market rents versus compensatory return, whichever was higher.

12. The Court stated: " * * * we are of the opinion that under the teaching of Baltimore & Ohio R. Co., a railroad cannot justify its charging of lower rents because of the depressive effect upon pre-existing market rentals of its action in constructing facilities to be rented at a substantially lower rental." 186 F.Supp. 40.

The divergence is even more graphic as to the element of failure to collect rents.

The tenants were the same in both proceedings. The rent due and payable was identical. The rent paid and unpaid was the same. The principal offender was Thomas N. Nelson & Company. It was over $135,000 in arrears. All tenants were in arrears an aggregate of $335,000. 186 F.Supp. 35; 288 F.2d 774–75.

The ICC held that this constituted unlawful discrimination and ordered that the Railroad cease and desist. This part of the order was not even attacked in the 3-Judge Court proceeding.[13]

But again, as we had done with these other critical legal standards promulgated by the ICC and affirmed by the 3-Judge Court and as to every related fact finding made by the Commission, we left this to the jury as well:

"We cannot say, as a matter of law, that the failure to collect rentals was so lacking in diligence that it constituted a violation of the Act. The trial judge properly submitted the question to the jury. Sufficient evidence supports the jury's verdict." 288 F.2d 775.

My position as to all of this is simple: the law may not say to a railroad that this lease is unlawful and must be discontinued, and at the same time say to the railroad that as to the very same lease, calling for payment of the very same rentals, relating to the very same tenants, a jury may nonetheless determine it to be legal.

This transcends this Court's euphemism of "paradoxical results."[14] It disregards altogether the right to recover damages as a sanction in the effectuation of an important congressional policy forbidding any and all kinds and types of discriminatory practices. Such a result frustrates the effectual enforcement of that policy. It leaves the body charged with the responsibility of a continuing policing of that grand scheme with the

power merely to make pious but academic declarations. True, a cease and desist order could be entered but as these two proceedings demonstrate, that is thought to be a matter of little importance to the railroad. By practices condemned outright by the ICC and which it may no longer carry on, it has built a terminal which unlawfully favors the tenants. The deed is done. By this Court's action it is not only permitted to litigate (as it properly should be entitled to) the question of whether such violations cause damage to competitors. It is permitted once again to litigate the underlying question whether those practices were unlawful.

This result would be avoided had the trial court and this Court paid proper heed to the doctrine of primary jurisdiction. United States v. Western P. R. Co., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126; Southwestern Sugar & Molasses Co. v. River Terminals Corp., 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, 1959 A.M.C. 1631; Far East Conference v. United States, 1952, 342 U.S. 570, 574–575, 72 S.Ct. 492, 96 L.Ed. 576; Federal Maritime Board v. Isbrandtsen Co., 1958, 356 U.S. 481, 498, 78 S.Ct. 851, 2 L.Ed.2d 926.

The nature of the doctrine of primary jurisdiction is discussed at length in the Western Pacific case, supra. It, says the Court, "like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." 352 U.S. 59, 63, 77 S.Ct. 161, 165. In contrast to "exhaustion" of remedies which merely is a precedence in point of time, primary jurisdiction "on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the ju-

---

13. See note 2, 186 F.Supp. 33.

14. See note 5, 288 F.2d 761

dicial process is suspended pending referral of such issues to the administrative body for its views." 352 U.S. 59, at page 64, 77 S.Ct. 161, at page 165. Of the two factors bearing upon its application, the one which has been "particularly stressed" more recently is "the expert and specialized knowledge of the agencies involved * * *." 352 U.S. 59, 64, 71 S.Ct. 161, 165. Desirable uniformity and expertness as two factors "are part of the same principle, 'now firmly established, that [1] in cases raising issues of fact not within the conventional experience of judges or [2] cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined * * *.'" 352 U.S. 59, 64, 71 S.Ct. 161, 165.

Its true nature is demonstrated by the fact that the "doctrine of primary jurisdiction thus does 'more than prescribe the mere procedural timetable of the lawsuit'." 352 U.S. 59, 65, 71 S.Ct. 161, 165. Thus the fortuitous fact that the jury trial was had prior to the time the 3-Judge Court enforced the ICC order, or the appeal in our Court was argued prior to the submission of the 3-Judge case but finally determined by the opinion of March 3, 1961 (288 F.2d 759) after the decision of the 3-Judge Court on July 18, 1960 (186 F.Supp. 29), are all factors of no decisive significance. The basic validity of this whole terminal project was before the Interstate Commerce Commission pursuant to the obligations imposed on it. It was required to and did determine that this project constituted unlawful rebates and favoritism. Once it made this determination concerning this single entire project, it became

a binding declaration[15] since primary jurisdiction "'is a doctrine allocating the lawmaking power over certain aspects' of commercial relations." 352 U.S. 59, 65, 71 S.Ct. 161, 165.

The operation of that doctrine here required that the District Court and this Court accept the expert judgment of the Commission concerning the basic legality or illegality of the project.[16] For the operation of the doctrine is that it "'transfers from court to agency the power to determine' some of the incidents of such relations." 352 U.S. 59, 65, 71 S.Ct. 161, 165.

I therefore respectfully

Dissent.

---

15. This does not mean, of course, that the decision of the administrative agency is not subject to judicial review. On the contrary, the 3-Judge proceeding is the precise means established by Congress to determine whether agency action is acceptable as a matter of law. The consequence of our decision is to set up two reviewing tribunals.

16. This would, to be sure, leave the question of causation and damages for the court proceeding.