SHAW WAREHOUSE COMPANY, Birmingham Ice and Cold Storage Company, and Boggs Cold Storage Company, Appellants,

v.

SOUTHERN RAILWAY COMPANY et al., Appellees.

No. 18138.

United States Court of Appeals
Fifth Circuit.

March 3, 1961.

David J. Vann, Birmingham, Ala., A. Alvis Layne, Jr., Washington, D. C., E. L. All, D. H. Markstein, Jr., Francis H. Hare, Birmingham, Ala. (White, Bradley, Arant, All & Rose, Hare, Wynn & Newell, Markstein & Cooper, Birmingham, Ala., of counsel), for appellants.

Jos. F. Johnston, Birmingham, Ala., William D. McLean, Washington, D. C., L. Drew Redden, Leigh M. Clark, William S. Pritchard, Birmingham, Ala. (Cabaniss & Johnston, Birmingham, Ala., Rogers, Howard & Redden, Birmingham,

Ala., N. K. Sneed, III, Washington, D. C., of counsel), for appellees.

Before HUTCHESON, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Shaw Warehouse Company, Birmingham Ice and Cold Storage Company, and Boggs Cold Storage Company sued the Southern Railway Corporation and two of its subsidiaries—The Alabama Great Southern Railway Company and The Georgia Industrial Realty Company [1]—under Sections 8 and 9 of the Interstate Commerce Act.[2] 49 U.S.C.A. § 8 and § 9. The complaint alleges that the defendants violated Sections 2, 3(1), and 6(7) of the Act.[3] 49 U.S.C.A. §§ 2, 3 (1), 6(7). These sections prohibit a railroad from giving "any undue or unreasonable" concession, such as a preference or rebate, or from departing from published tariffs.

The case is unusual. The plaintiffs are not shippers or receivers of freight. They do not purport to render transportation services. Shaw Warehouse is served by Southern, but the other plaintiffs have no direct relationship with the carrier. The plaintiffs are public warehouse companies in Birmingham, Alabama. Each claims damages for business losses attributable to discriminatory rental practices in Southern's operation of a terminal, the Birmingham Food Terminal Corporation. The Act goes back almost seventy-five years. 24 Stat. 379 (1887). In a number of cases, Courts [4] and the Interstate Commerce Commission have held that a railroad's rental practices in operating a terminal may violate the Act,[5] but we have been able to

---

1. Georgia Industrial Realty Company is a wholly-owned real estate holding company that acts as the land department of the Southern. It is a defendant only in the action brought by Birmingham Ice.

2. Section 8 of the Interstate Commerce Act (49 U.S.C.A. § 8) reads: "That in case any common carrier subject to the provisions of this part shall do, cause to be done, or permit to be done any act, matter, or thing in this part prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this part required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this part, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."

Section 9 of the Interstate Commerce Act (49 U.S.C.A. § 9) reads: "Any person or persons claiming to be damaged by any common carrier subject to the provisions of this chapter * * * may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; * * *"

3. Shaw and Boggs allege also a violation of Section 20(a) of the Act. We find it unnecessary to discuss this section, since we consider it clearly inapplicable.

4. See, for example, Baltimore & Ohio R. Co. v. United States, 1939, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318, affirming D.C. 1937, 20 F.Supp. 372, in which the Court indicated that warehousemen suffered severe damages.

5. In a proceeding before the Interstate Commerce Commission, instituted by Shaw Warehouse Company, in which Birmingham Ice & Cold Storage intervened, the Commission issued an order requiring Southern to cease and desist from the same practices complained of here. Shaw Warehouse Co. v. Southern Railway Company, et al., 308 I.C.C. 609 (1955). Southern sued to enjoin and set aside the Commission's order. A three-judge court upheld the report and order of the Commission. Southern Railway Company v. United States, D.C. N.D.Ala.1960, 186 F.Supp. 29. On the request of counsel for the parties, Judge Seybourn H. Lynne, the trial judge in the private litigation, did not recuse himself. Judge Lynne was the organ of the three-judge court.

Appellants assert that the Commission decision is authoritative and that failure of this Court to decide in their favor will produce "paradoxical results". But the thrust of this private litigation and the thrust of I.C.C. proceedings in the interest of the public are different: the

find only one case in which a warehouseman sued a carrier for damages based on discriminatory rental practices.[6]

The complaint alleges that the Terminal leased warehouse facilities to the plaintiffs' competitors at rentals lower than the prevailing rentals for such facilities in Birmingham and did not require the tenants to make timely payments of rent. Such concessions would reduce the tenants' need for working capital. As a result of this unlawful advantage, the plaintiffs say, their competitors at the Terminal were able to cut rates and offer attractive inducements to customers—causing the plaintiffs to lose some of their storage accounts and to make costly rate reductions to keep other accounts. Southern, so the argument runs, expected to offset losses from concessions with increased freight revenues.

Southern denies that it made any undue concessions, asserts that there was no discrimination in relation to transportation (prerequisite to the plaintiffs' recovery under the Act), and insists that in any event there was no causal connection between its actions and the alleged injury, if any, to the plaintiffs. Southern argues that the plaintiffs seek to protect an entrenched warehousing position at the expense of consumers and the food distribution industry in the Birmingham area.

The district court consolidated the three suits for trial before a jury on the sole issue of the defendants' liability.[7] The court narrowed the major factual issues to two: (1) "Was the rent charged to the tenants of the Birmingham Food Terminal a fair rental, in view of all the circumstances, a fair market rental, or was it less than the fair market rental, or was it less than a compensatory rental?" (2) "[If] you decide that it was a fair market rental and that it was a compensatory rental, then there would be a second question because the plaintiff is saying in each case that if it is conceded that the rental was a fair market rental or a compensatory rental, the railroad was guilty of unlawfully extending its credit to the tenants by failing to use due diligence in collecting the rent." The jury returned verdicts for the defendants.

We hold that the district court properly refused to direct a verdict, properly submitted the case to the jury, and properly charged the jury. Substantial evidence supports the verdicts.

## I.

A compressed review of the complex background facts relating to the promotion and financing of the Terminal is essential to an understanding of the issues.

For several years prior to 1954, Southern attempted to sell certain property in

issues of causation and injury present in this case were not present in the I.C.C. proceedings. The records are different. There was considerable evidence before the jury that was not before the Commission. The jury may have found that Southern violated the Act, but that the violations caused no injury to the defendants. There is no necessary inconsistency, therefore, between the jury's finding and the Commission's finding.

The appellants had the right to seek damages before the Commission or before the district court. They chose the district court. They failed in that forum. We are unimpressed with the argument that we should reverse the verdict in the forum below on the strength of a finding in another forum. The opinions of the Commission and of the three-judge court are valuable on the questions of law

pertinent to this appeal, and to that extent are entitled to weight. With deference to the Commission and to the three-judge court, this Court still must decide the appeal on the record before us and in the light of the law as we read it.

6. Pittwood v. Northern Pacific Railway, 51 I.C.C. 635 (1918); order approved in Fireproof Storage Co. v. Hines, D.C. E.D.Wash.1919, 261 F. 215.

7. At the conclusion of the evidence, both the plaintiffs and the defendants moved for directed verdicts. The trial judge denied the motions. After the jury returned verdicts for the defendants, the plaintiffs moved for judgments notwithstanding the verdicts, or, in the alternative, for new trials. The motions were denied. The actions were consolidated for appeal.

Birmingham known as the Finley Yard. This was the site of an abandoned roundhouse and some twenty dilapidated buildings that became obsolete when Southern substituted diesel locomotives for steam locomotives. In January 1954 the Jefferson County Truck Growers Association, a farmers cooperative, showed an interest in the property as a possible location for a new produce market outside of the congested business section of Birmingham. The Truck Growers are not shippers or receivers of freight in interstate commerce, and could not conceivably compete with the plaintiffs. The Association's interest happened to coincide with a program of the railway for developing produce terminals in Chattanooga, Knoxville, Louisville, Richmond, and other cities as a bona fide freight-producing endeavor. So, the defendants say. Using the Truck Growers Association as a nucleus for a unified food warehousing facility located at a point outside the reciprocal switching district, Southern expected to gain new revenues estimated at $300,000 to $500,000 a year. The location would allow the Terminal to be served exclusively by Southern and its system lines, giving Southern a virtual monopoly of the produce traffic and forcing produce dealers in the area to move to the Terminal or perish. So, the plaintiffs say.

In April 1954, to help the initial promotion, Southern employed one Joseph DeOreo, a professional promoter experienced in railroad freight promotions.[8] Southern, working with the Truck Growers, expanded the project into a fully integrated food terminal, including cold and dry storage warehouses, to be used in storing, processing, and distributing food and related products. The facilities were to be leased for long terms, at the expiration of which the

property would be sold to the tenants. The organizing efforts went on for months. They were open and above board. Anyone had the right to participate—a right of dubious value to established warehouses long settled at their own locations. In February 1955 Southern and other interested persons finally organized the Birmingham Food Terminal and incorporated it, primarily as a conduit to Southern but also to establish a legal entity to deal with financing companies and contractors. The Terminal corporation is a shell; it is a non-profit corporation having no office space and no employees.

The original stockholders in the Terminal Corporation were the prospective tenant-purchasers. Only two of these, Nelson Company and Birmingham Terminal Cold Storage Company, were competitors of the plaintiffs.

The organizers' plan contemplated a sale of the Finley property (84.935 acres at $2500 an acre) from Southern through the Realty Company to the Terminal, without any down-payment and with the use of Southern's credit to obtain financing at a rate favorable to the purchasers. In payment, the Realty Company was to take a second mortgage from the Terminal on which four per cent interest would be paid annually, the principal to become due in twenty-five years. The Terminal Corporation was to finance the costs of construction by a loan from a lending agency, the loan to be guaranteed by Southern and secured by a first mortgage. Terminal would then lease the land and improvements to Realty Company for twenty-five years at a rental equivalent to the payments required under the first mortgage. This lease would be assigned to the lending agency as collateral security. Thereafter, the Realty Company would lease back to Terminal

8. DeOreo helped promote the Union Pacific's Food Terminal at Kansas City. See Union Pacific R. Co. v. United States, 1941, 313 U.S. 450, 61 S.Ct. 1064, 85 L.Ed. 1453; footnote 18. According to the plaintiffs, DeOreo was to head off the efforts of the Truck Growers Association to build a new produce market of its own that might block Southern's scheme. Instead, DeOreo was to use the Truck Growers to "corral" enough large rail receivers to force all of them to "join the parade or perish".

Corporation the same property for the same rental period at substantially the same rent. The property would then be sold to the tenant-purchasers, subject to the mortgages and leases.

To secure the first mortgage loan Southern would execute an agreement with the first mortgagor guaranteeing the performance of all the obligations assumed by Realty Company under its lease of the property from Terminal Corporation. The purpose of this guarantee was to permit each tenant to purchase his facility independent of the other tenants, without being required to make any down-payment on the purchase price. At the same time, it made possible a low interest rate because of reliance on Southern's credit. The purchase price included the interest costs of the interim financing required during the period of actual construction. The plaintiffs contend that the price did not represent anything like the full value of the property, since Southern was to pay a part of the costs and retain title to certain track and tramway areas. The alleged gap between the price and the value of the property is of critical importance, because the rental formula depended on the cost-base.

After the company was organized, Terminal obtained a commitment for a construction loan from the Equitable Life Assurance Society. Terminal engaged a building contractor. The contractor ordered steel fabricated specially for the building. Many of the prospective tenant-purchasers cancelled existing leases and made commitments preparatory to moving to the Terminal. The project was progressing smoothly according to plan when in September 1955 four competing carriers joined by Birmingham Ice, one of the plaintiffs here, filed a petition with the Interstate Commerce Commission questioning the legality of Southern's program for organizing food and produce terminals. Equitable Life promptly withdrew its commitment. The promotion collapsed.

Southern, faced with this emergency and under a strong moral obligation as well as a legal obligation to extricate the tenant-purchasers from their unhappy lot, agreed to go forward with construction of the project for its own account, and thereafter lease the facility to the Terminal Corporation. A new agreement was entered into October 18, 1955, referred to in the proceedings below as the "Round Robin Agreement". This agreement requires Southern to complete the project and to lease the facilities to the tenant-purchasers under a separate lease to each, for a period of five years, with an option to renew for five years. Rental was fixed at the annual rate of eight per cent of the cost-base represented by the sales price, the Terminal Corporation to pay the costs of utilities and the Realty Company to pay taxes, insurance, and maintenance costs. The new agreement provides that the parties shall revert to their original plan, should that plan, to the satisfaction of Southern, be held valid by the proper authorities. The tenants were given an option to purchase the property at the cost price provided in the original plan at any time during the potential ten-year term of the lease.

The building was not completely finished until July 1957 but some of the tenants were permitted to occupy partially completed buildings at rentals based on percentage of occupancy and on the rental cost-base formula. In virtually all instances the billing and collection of these rentals lagged several months behind their due dates. As of January 1958, all of the tenants were in arrears since September 1957 or earlier. Nelson Company, the first occupant and the competitor the plaintiffs especially condemn, moved in May 15, 1956. This company, a corporation with a capital of about $4,500, was furnished facilities costing more than $1,000,000. The Terminal finally evicted the company. (During the hearing before the Commission, Southern instituted an action against Nelson Company and Terminal Corporation for $135,000 in rental arrears.) Birmingham Terminal Cold Storage Company, the plaintiffs' other competitor

at the Terminal, started with a capital of $1,000 (as any corporation may under the Alabama law). It was furnished cold storage facilities costing in excess of $1,-000,000. This company too was evicted for non-payment of rent ($65,000). The record shows, however, that a genuine dispute arose between Southern and the tenants over the proper amount of the rent under the Round Robin Agreement, because of the difficulty of ascertaining the accumulated costs essential to the computation of charges. This dispute delayed billing and collection of rents during the period of construction. It was not resolved until the tenants filed suit and a declaratory judgment was entered.

The Terminal has thirty buildings, several driveways, areas for future expansion, a restaurant, a filling station, and sixteen spur tracks. It occupies a rectangular area, 3,000 feet in length by 1500 feet in width. The buildings were constructed to the tenants' specifications, subject to certain basic standards. There are twenty-two tenants, not all of whom are stockholders of the Terminal Corporation. The buildings cost $6,125,-690. According to Southern, the final rental-sale cost-base was $7,327,860; according to the plaintiffs, the minimum cost was $8,280,000. The difference of $952,000 represents items Southern allegedly improperly excluded from the cost-base.[9]

## II.

Southern's motion for a directed verdict raises a serious question. Southern maintains that the plaintiffs sued and tried the case on an indefensible theory. Even if it be assumed that Southern violated Sections 2, 3(1), and 6(7) of the Act, the plaintiffs have failed to allege or to prove any injury to them caused by unjust *discrimination relating to transportation*, as required for the recovery of damages under the Act.

We note, first, that Sections 8 and 9 are narrower in scope than Sections 13(1) and 13(2). Section 8 allows an action for damages "to the person or persons injured * * * in consequence of any * * * violation" of the Act.[10] Section 9 allows "any person or persons claiming to be damaged" to sue in the district court. Section 13(1) allows "any person" to file a complaint with the Commission "complaining of anything done or omitted to be done by any common carrier * * * in contravention" of the Act. Section 13(2) allows the Commission to proceed on its own motion, and "no complaint shall at any time be dismissed because of the absence of direct damage to the complainant". Consequently, decisions dealing with the standing of a warehouseman to file a complaint with the Commission or decisions involving the validity of the Commission's cease and desist orders against warehousemen are not necessarily applicable

---

9. Minimum Cost Exclusions by Southern—According to Plaintiffs.

| Cost | Minimum Cost | Cost Base | Minimum |
|---|---|---|---|
| | Table II | Table III | Excluded |
| Paving, etc. | $ 619,586.42 | $ 538,718.36 | .$ 80,868.06 |
| Water System | 107,502.98 | 110,577.19 | (3,074.21) |
| Storm Sewers | 217,516.85 | 211,437.45 | 6,079.40 |
| Sanitary Sewers | 54,221.31 | 51,278.81 | 2,942.50 |
| Land | 255,480.00 | 199,215.00 | 56,265.00 |
| Grading | 412,893.18 | —0— | 412,893.18 |
| Tracks | 111,000.00 | —0— | 111,000.00 |
| Interest Cost | 285,238.78 | —0— | 285,238.78 |
| | $2,063,439.52 | $1,111,226.81 | $952,212.71 |

10. See footnote 2.

to a warehouseman's suit against a carrier for damages.

Section 2 prohibits "unjust discrimination" by special rate, rebate, drawback, "or other device", "directly or indirectly". Section 3(1) prohibits "any undue or unreasonable preference or advantage * * * in any respect whatsoever". Section 6(7) requires strict adherence to published tariffs, without regard to any particular discrimination; but, without the element of discrimination there can be no injury to one suing as a result of a departure from published tariffs. Each of these three sections,[11] then, requires discrimination as an essential element of a violation of the Act upon which an action for damages may be based. "What is unlawful in the action of the carriers inheres in its discriminatory quality, and not in anything else." Interstate Commerce Commission v. United States, 1933, 289 U.S. 385, 53 S.Ct. 607, 609, 77 L.Ed. 1273. In this connection, we note that Sections 2, 3(1), and 6(7) differ from the Elkins Act, 49 U.S.C.A. §§ 41–43, which prohibits departure from the published tariff rates "irrespective of its actual discriminatory effect." Cases under the Elkins Act, therefore, are not necessarily applicable to the instant case.

The statutory prohibitions have been applied broadly,[12] but, in terms, the Act penalizes a carrier for discrimination only with respect to transportation. Thus, Section 2 prohibits rebates and special rates "for any service * * * rendered, in the transportation of passengers or property". Section 6(7) repeats the phrase "transportation of passengers or property". Section 3(1) does not refer specifically to transportation, but it is construed as so limited: "[T]he act is intended to deal with transportation * * *. The subject of the 'preference' or 'prejudice' is transportation of either persons or property." In re Huntington, D.C.S.D.N.Y.1895, 68 F.

11. Section 2 of the Interstate Commerce Act (49 U.S.C.A. § 2) reads:

"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property * * *, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation * * * of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

Section 3(1) of the Interstate Commerce Act (49 U.S.C.A. § 3(1)) reads:

"It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of

traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. * * * *"

Section 6(7) of the Interstate Commerce Act (49 U.S.C.A. § 6(7)) reads:

"* * * * nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation or passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers, or property, except such as are specified in such tariffs."

12. See United States v. Union Stock Yard & Transit Co., 1912, 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226; Southern Pacific Terminal Co. v. I. C. C., 1911, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310; United States v. General Motors, 3 Cir., 1955, 226 F.2d 745; Central of Georgia R. Co. v. Blount, 5 Cir., 1917, 238 F. 292; Vandalia R. Co. v. United States, 7 Cir., 1915, 226 F. 713; Cleveland, C. C. & St. L. R. Co. v. Hirsch, 6 Cir., 1913, 204 F. 849, 852, 853.

881, 882. The Act defines "transportation" broadly. The term includes "all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and *all services in connection with* the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported". 49 U.S.C.A. § 1(3). "Transportation", then, embraces terminal facilities used in the delivery, storage, or handling of freight—but this language does not solve the problem here. For discrimination, to exist, there must be a person prejudiced and a person favored. There is no proper basis for comparison unless there is substantial identity of situation and service, accompanied by an undue advantage to one to the disadvantage of the other.[13] And, under Section 8, the plaintiffs still must show they were *injured by unlawful discrimination in relation to transportation.*

Pittwood v. Northern Pacific Ry. Co., 1918, 51 I.C.C. 535 is the only decision passing on the validity of a warehouseman's claim for damages against a railroad for an injury allegedly caused by an unjust discrimination.[14] Pittwood owned and leased a building, suitable for a warehouse, immediately adjacent to the Northern Pacific's railroad tracks in Spokane, Washington. He filed a complaint with the Interstate Commerce Commission asking for damages on the ground that the Northern Pacific rented warehouse property to shippers at nominal rentals. Pittwood contended that because of the carrier's low rentals he was unable to obtain a tenant. The Commission held: "A warehouse owner, a landlord seeking to rent his property, as such, has no relation with a common carrier which could result in a discrimination against him in violation of the act to regulate commerce. The discrimination there forbidden is in respect of transportation." The discrimination, such as it was, "was directed not against complainant or other warehouse owners, but against those shippers who were not lessees of defendant's warehouse"; "manifestly" the damages allegedly suffered "were not the direct and proximate consequences of discrimination between shippers by defendant". Later, Fireproof Storage Company, the successor in interest of Pittwood, filed suit for damages in the district court, relying on the same facts Pittwood had relied on in the I.C.C. proceedings. The court dismissed the complaint, stating: "[A] warehouse owner is not entitled to recover damages for depreciation in the rental value of his property as a result of leases by a railroad company of similar property at nominal rentals to shippers." Fireproof Storage Co. v. Hines, D.C.E.D.Wash. 1919, 261 F. 215, 217.[15]

13. See United States ex rel. Pitcairn Coal Co. v. Baltimore & O. R. R., 4 Cir., 1908, 165 F. 113, 121, reversed on other grounds, 1910, 215 U.S. 481, 30 S.Ct. 164, 54 L.Ed. 292; United States ex rel. Northwestern Warehouse Co. v. Oregon R. & Navigation Co., 1908, C.C.D.Ore. 1908, 159 F. 975, 979; Logan Coal Co. v. Pennsylvania R. Co., C.C.E.D.Pa.1907, 154 F. 497, 500; Delaware, L. & W. R. Co. v. Kutter, 2 Cir., 147 F. 51, 63, certiorari denied, 1906, 203 U.S. 588, 27 S. Ct. 776, 51 L.Ed. 330.

14. Commenting on the dearth of personal injury actions under provisions of the Federal Communications Act, 47 U.S. C.A. § 151 et seq., comparable to Sections 8 and 9 of the Interstate Commerce Act, the court stated, in Curran v. Mackay Radio & Telephone Co., D.C.S.D. N.Y.1954, 123 F.Supp. 83, 89: "The absence of any such proceeding before the Interstate Commerce Commission or before the Federal Communications Commission and the absence of any such action in the Federal courts shows the construction which has been placed on Sections 8 and 9 of the Interstate Commerce Act and on Sections 206 and 207 of the Communications Act by members of the Bar who specialize in personal injury actions."

15. Mr. Pittwood was not a man easily discouraged. He intervened in Leases and Grants of Property by Carriers to Shippers, 1922, 73 I.C.C. 671, a proceeding instituted by the Commission on its motion. The Commission said: "In this proceed-

The plaintiffs insist that in a later case the Commission overruled Pittwood. They refer to McCormick v. Pennsylvania Railroad Co., 1925, 95 I.C.C. 301; 1928, 148 I.C.C. 299; order sustained in Terminal Warehouse Co. of Baltimore City v. United States, D.C.Md.1929, 31 F.2d 951. In the first McCormick case, the warehouseman complained to the Commission that three railroads in Baltimore had made concessions to certain preferred warehouse companies. McCormick conceded it was not "in any sense a shipper or receiver of freight". The Commission, relying on Pittwood, held: "When consideration is given to the assertion of complainant that it is not a shipper or receiver of freight, the conclusion must be reached that it has no relation with a common carrier which could result in a discrimination against it in violation of the Interstate Commerce Act. The discrimination there forbidden is in respect to transportation." McCormick then amended the complaint by eliminating all of the defendants except the Pennsylvania and alleging that both complainant and Terminal Warehouse Company, the preferred warehouse company, were shippers served by the Pennsylvania. The amended complaint charged that the Pennsylvania, in the form of allowances for loading and unloading carload package freight, made refunds to Terminal, thereby collecting less compensation from Terminal than it collected from McCormick for "rendering like and contemporaneous transportation services under substan-

tially similar circumstances and conditions, in violation of Sections 2 and 3" of the Act. After a hearing on the amended complaint, the Commission issued a cease and desist order. Terminal filed suit in the district court to enjoin and set aside the order. The Court approved the order of the Commission.

We do not read McCormick as overruling Pittwood. Nor does it appear that the Commission considered that it was overruling Pittwood. After amendment of the complaint, McCormick concerned two shippers and a discriminatory allowance to one for what were clearly transportation services. Moreover, McCormick was not an action for damages, as was Pittwood, but was a proceeding for a cease and desist order. As the Commission itself recognized in the proceeding instituted by Shaw Warehouse against Southern, "[t]he Commission is the guardian of the general public interest and proceedings before it are not in the nature of private litigation." Shaw Warehouse Co. v. Southern Railway Co., et al., 308 I.C.C. 609, 611 (1955).

Nevertheless, the second McCormick opinion is based in part on reasoning that supports the plaintiffs' position here. The Commission stated: "It is our view that the Terminal [Warehouse Co.], even though not the owner of the goods, has been given dominion over such goods for transportation purposes and that accordingly for transportation purposes it should be deemed to be the consignor of shipments from and consignee of shipments to its warehouse."[16] 148 I.C.C.

ing, no shipper or receiver of freight at Spokane complained of the leases made by the railway company or alleged that they were in any way unduly prejudicial to him or unduly preferential of his business competitors. Complaints were made by owners of warehouses in Spokane, who contended that they were unable to lease their properties on advantageous terms because of the competition of the railways in the matter of rental charges. One of these complaints were separately heard in Spokane at the time of the hearing in this investigation. The complainant was not a shipper, and we held that we were without jurisdiction

to grant the relief requested. Pittwood v. N. P. Ry. Co. * * * See also Fireproof Storage Co. v. Hines. * * *" 73 I.C.C. at 681.

16. In the McCormick case there is no intimation that all warehousemen should be treated as shippers. In its opinion, the Commission carefully mentioned specific referents: the dealings of the defendant carrier were with the complainant, and not with the owners of the freight; as to many of the inbound shipments, the complainant was the only party to whom delivery of car-load shipments could be made, the real owners

301, 306. Similarly, Judge Lynne, in Southern Railway Co. v. United States, D.C.1960, 186 F.Supp. 29, 42, speaking of the same warehouse companies which are the plaintiffs here, pointed out that warehouses, like freight forwarders, are so closely connected with transportation that they should have the status of shippers and receivers of freight.

The Supreme Court has sanctioned this principle in cases upholding orders of the Commission. Merchants' Warehouse Co. v. United States, 1931, 283 U. S. 501, 51 S.Ct. 505, 75 L.Ed. 1227, affirming D.C.E.D.Pa.1930, 44 F.2d 379, sustaining Gallagher v. Pennsylvania R. Co., 160 I.C.C. 563 (1929); Terminal Warehouse Co. v. Pennsylvania R. Co., 1936, 297 U.S. 500, 56 S.Ct. 546, 80 L. Ed. 827, affirming 3 Cir., 1935, 78 F.2d 591, overruling D.C.E.D.Pa.1934, 7 F. Supp. 484. See also Propriety of Operating Practices—New York Warehous-ing, 198 I.C.C. 134, 1933), 216 I.C.C. 291 (1936); affirmed, 220 I.C.C. 102 (1937); and sustained, Baltimore & Ohio R. Co. v. United States, D.C.1938, 20 F.Supp. 273, affirmed 1939, 305 U.S. 507, 59 S.Ct. 284, 290, 83 L.Ed. 318.[17] In the Baltimore and Ohio case one of the carriers had leased space to a warehouse company at less than the cost of the space to the carrier. The Supreme Court observed that unlawful discrimination even as to non-transportation services violates Section 6(7), since "a savings on the non-transportation services obviously figures out the same as a rebate on the transportation service". See also Union Pacific R. Co. v. United States, 1941, 313 U.S. 450, 61 S.Ct. 1064, 1072, 85 L.Ed. 1453, a case under the Elkins Act, however, in which the carrier, operating a food terminal with a city, was required to charge rentals on the basis of the fair rental value of the facilities.[18] Emerg-

being out-of-town companies which shipped to the complainant for distribution in less-than-carload lots; the owners gave the complainant dominion over the goods for transportation purposes.

17. Propriety of Operating Practices—New York Warehouses, 198 I.C.C. 134 (1933) and 216 I.C.C. 291 (1936) aff'd 220 I.C.C. 102, 1937, was a result of the Commission's comprehensive investigation of indirect concessions by railroads to warehouses in the New York area. Some of the railroads granted concessions such as the in-transit service of removing cargo from water-carriers, storing the cargo for a long period, and reloading it upon railroads, at noncompensatory rates. The nature of some customers' business prevented their using this in-transit service. On the complaint of competing warehouse operators the Commission issued an order directing certain carriers to cease performing the services at less than compensatory rates. The carriers brought suit to enjoin enforcement of the order, contending, among other contentions, the Terminal facilities were not transportation services. In Baltimore & Ohio R. Co. v. United States, 1939, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318, affirming 20 F.Supp. 273, the Supreme Court affirmed the district court's dismissal of the suit. The Court stated:

"As the shippers of the Port of New York district can utilize, in many instances, commercial storage and other warehousing services in addition to rail transportation, a saving on the non-transportation services obviously figures out the same as a rebate on the transporation service. It is immaterial that the shipper pays fair value or the market price for the extra privilege he enjoys. Section 6(7) of the Act forbids the carrier to receive less than the published rates for transportation or to remit 'by any device any portion of the rates.' When services, not necessary for transportation, are furnished below cost in an effort to acquire rail transportation, as was done here, this provision is violated. * * *"
In this case the Court found that by furnishing commercial warehouse services (non-transportation services) at less than cost the carriers were, in effect, making a concession from published freight rates, a clear violation of Section 6(7). It is less clear that the carriers violated Sections 2 and 3(1), but, it should be noted, the discrimination was in favor of *shippers* using the railroad-owned and railroad-operated warehouses.

18. In this case the Union Pacific joined with Kansas City, Kansas, to promote a food terminal with cold storage facilities. The food terminal formerly supplying the

ing from these cases "is the clear rule that rents railroads charge for facilities leased for the purpose of attracting freight must be no less than the prevailing market rents in the area". Judge Lynne, in Southern Railway Company v. United States, D.C.1960, 186 F.Supp. 29, 37.

■ These cases are all distinguishable from a damage suit, for the reasons previously stated. However, they establish the principle, pertinent here, that for purposes of determining discrimination relating to transportation, a warehouseman, aggrieved by a carrier's favored treatment of a competing warehouseman, comes within the long protective reach of the Act—although he may not be a shipper and although the alleged discrimination itself is primarily of a non-transportation nature.

Consignment of freight to warehouses and the services performed in receiving, handling, storing, and delivering freight do relate to transporting goods in commerce. The question narrows then to whether: (1) the particular warehouseman in suit is so directly in the stream of transportation that he should be treated as a shipper on a competitive basis with actual shippers and with other warehousemen who must be treated as shippers; and (2) is also so similarly situated that he would be affected adversely by the carrier's favored treatment of a competitor. Pittwood's viability and lonely position as the unique precedent against a warehouseman's suit for damage are not inconsistent with these views. In Pittwood the injury was to a landowner whose real estate investment depreciated in value; the injury was not the result of discrimination with relation to transportation. The instant case is somewhere between Pittwood and McCormick.

The question is essentially a factual one that should be resolved by a jury. (1) Southern, however, makes a good case for its motion for a directed verdict. The concessions, if any, were in favor of tenants against non-tenants; not in favor of some users of the railroad against other users in similar circumstances. And, a decline in rental value of warehousing property in downtown Birmingham was inevitable after Southern trebled available warehousing space in the city and put up a modern food terminal with cold and dry storage facilities. It is not shown that Southern exerted any control over the rates or trade practices of the tenants. There is no evidence that any customer, allegedly enticed to the Terminal by a tenant competitor, ever shipped or received anything by rail. None of the plaintiffs is a shipper, receiver, user, or customer of the railroad.

city was located in Kansas City, Missouri, and was served by several railroads. The Union Pacific was the only railroad in a position to serve the new market. To induce the merchants to move, the Union Pacific offered to make good losses and expenses caused by moving, take over leases, and give free rent, bonuses, and advertising. The district court enjoined the City and the Union Pacific from giving such concessions on the ground that it resulted in a lowering of the published tariffs and constituted rebates to the favored shipper in violation of the Elkins Act. The Supreme Court, affirming the district court said: "The statute specifically requires that the concession given or received shall be 'in respect to the transportation of any property in interstate or foreign commerce by any common carrier.' As the language of the section covers indisputably the carrier and the freight involved in movement into and out of a metropolitan terminal market, only the phrase 'in respect to the transportation' requires analysis. What has been said shows its meaning connotes more than discrimination in payment of tariffs. Offering or soliciting the concessions explicitly violates the section. * * * The concessions are none the less illegal, if made for non-transportation services, as long as they result in lowering directly or indirectly transportation costs to a shipper. * * * Where traffic is an object, and discriminatory advantage the means employed in attempting to obtain or actually obtaining it, there is a violation of the section in respect to transportation."

No shipper testified against Southern. The Terminal was constructed to attract a variety of businesses. For example, the Truck Growers, producing no freight traffic, occupied one-fourth of the total area. (2) But the plaintiffs have a story to tell, too. They were in competition with two of the Terminal's tenants. It is a fair inference that these competitors passed on to their customers the concessions the railroad made to them. One of the plaintiffs, Shaw Warehouse, operates two public dry storage warehouses in Birmingham, both of which are served exclusively by Southern. Mr. Shaw described his company as a "freight station". All of the plaintiffs operated businesses that were a part of the rail freight distribution system: each received and shipped for customers, advanced freight charges at times, and handled in-transit shipments, stopover cars, and pool cars.

 The Court is unwilling to say, as a matter of law, that a warehouse company cannot recover damages for unjust discrimination unless it is a shipper or user of the railroad, or that, in this case, the evidence shows beyond a reasonable doubt the plaintiffs were not injured by discrimination with respect to transportation. We prefer to err, if it be error, on the side of carrying out the broad policy of the Act of eliminating concessions by a railroad of any kind, direct or indirect, to the end that persons in the stream of transportation may carry on their business on an equal basis with their competitors. "The Interstate Commerce Act * * * uses language of the broadest type to bar discriminations of all kinds." Boynton v. Virginia, 1960, 364 U.S. 454, 81 S.Ct. 182, 184, 5 L.Ed. 2d 206. That policy requires us to narrow, not widen, a carrier's escape hatch from liability for violation of the anticoncessions provisions of the Interstate Commerce Act. We hold then that it is a question of fact for the jury whether, in the circumstances of the case, the injury to the plaintiffs, if any, was caused by unjust discrimination in relation to transportation. This type of case requires the trier of facts to sift involved facts and contradictory inferences. It is a case a jury is peculiarly fitted to decide.

## III.

The first major issue put to the jury was whether, "in view of all the circumstances" the Terminal rents were "less than a fair rental". The Court defined a fair rental as "the fair market rental" and also as "a compensatory rental" yielding a fair return on capital. In his instructions, the trial judge made it clear that there is nothing necessarily improper in a carrier's ownership and operation of a terminal; a carrier's furnishing of facilities or services to shippers or to persons assimilable to shippers may violate the Act only if the facilities or services are furnished at such rates as to amount to an undue concession or discrimination. The issue comprises several sub-issues. One of the most important concerns depreciation.

A. The record shows that the prevailing practice in Birmingham was to figure rent on the basis of eight per cent of the value of the land and ten per cent of the value of construction costs and certain other expenses. The record is not so clear as to the applicability of this rule of thumb, regardless of time, place, and type of property. All the witnesses agreed, however, that the only reason for a rental rate greater than eight per cent was the element of depreciation. Southern used eight per cent as the rental factor on construction costs. Should Southern have included depreciation in its rental formula? Was the trial court correct in instructing the jury that if Southern and the tenants intended at all times to revert to the original sales plan, the element of depreciation should not be included in determining the adequacy of the rents?

Southern did not work depreciation into the rents and the trial judge charged as he did, because the original agreement between Southern and the tenant-purchasers was that the property and facilities would be purchased at undepreciated cost, the rentals paid in the in-

terim *not* to be credited to the purchase price. The "Round Robin Agreement" of October 18, 1955, also bound the tenants to purchase. There is nothing in the record to show that the tenants are not ready, willing, and able to go through with the purchase if, according to the agreement, the original sale plan is determined by proper public authority to be valid.

The plaintiffs' theory is that the charge was erroneous, even if eventually the property would be purchased at the undepreciated cost, because the rent would result in the indirect loan, without interest, of the depreciation—until the sale occurred. As a result, they argue, the carrier unlawfully furnished working capital to the tenants.

The argument carries a little aroma of plausibility. Depreciation, however, should not be reified. It is not a tangible thing that can be given or received. Depreciation is an assumed decline in value, or loss, attributable to wear and tear, taken into consideration for various purposes, with the hope that the owner can restore his capital asset at the end of its estimated life by amortizing its cost over its life span. The plaintiffs' theory would allow Southern to recover the depreciation twice, once in the sale and a second time by including the element of depreciation in computing the cost-base for rentals.

■■ The trial judge instructed the jury that if it found the Terminal's tenants did not intend to purchase the property, the jury should consider depreciation in deciding the adequacy of the rents. Several times, once in response to a question from a juror "about the compensatory part", the trial judge carefully stated that question for the jury: "Were the rents charged the tenants less than the fair market rent or less than compensatory rent." So stated, the instruction is favorable to the plaintiffs. It is not contended that the rents were below cost, but only that Southern furnished facilities at less than a compensatory re-

turn on the full value of the facilities. We consider that fair rental value, that is, "fair market rent", rather than a compensatory return is the proper standard, at least in this type of action, because the suit rests on a claim for damages caused by destructive competition. There is authority, however, that even in an I.C.C. proceeding the "cost of facility is only persuasive". Union Pacific Railroad Co. v. United States, 1941, 313 U.S. 450, 61 S.Ct. 1064, 1077, 85 L.Ed. 1453. As we read the record, and considering the warehouse space in the Birmingham area, the jury could have concluded that the plaintiffs failed to show that it was economically feasible for Southern or for the warehousemen to obtain tenants willing to pay rent that would yield ten per cent on warehouse buildings. This Court must assume that if the jury found it necessary to consider depreciation, it found that the rents were not only at the market value but yielded a conpensatory return.

■ B. The warehousemen level a broadside at the purchase price as an illegal concession, charging that by omitting certain proper cost items Southern would allow the tenants to purchase at less than cost and, in the meantime, the tenants are paying rents (based on the purchase price) that are too low.[19] These items include: (1) the value of the land in excess of $2500 an acre, (2) cost of removing tracks and demolishing existing structures, (3) cost of installing service tracks, (4) cost of paving areas, (5) cost of grading and levelling areas to be used for building construction, expansion areas, and driveways, (6) value of land for tracks and vehicular areas. There is a great mass of conflicting evidence on the items alleged to have been improperly omitted. Southern produced witnesses who testified that: (1) the value of land did not exceed $2500 an acre; (2) the cost of removing tracks and razing old buildings would have been incurred without construction of the Terminal and are not an includible item

---

19. See footnote 9.

in determining the cost-base; (3) some of the tracks were adjacent to the Jefferson County Truck Growers Association (neither a shipper nor receiver of freight by rail), some were not in the Terminal area, some were for public loading and unloading, some will be retained by Southern for future expansion; (4) paving costs, except for track areas, were included in the rent base and proposed purchase price; (5) the grading entailed merely excavating the land and spreading it, without any substantial enhancement in the value of the property. In final analysis the propriety of Southern's including these items in fixing rentals and the weight to be attached to any one or more of these items were questions for the jury.

C. The original purchase plan contemplated Southern's transfer of 85 acres for $212,500 on a 25-year 4% second mortgage with no payments on principal until the end of the term. In addition, Southern was to spend $355,000 secured by a similar mortgage with the requirement that the principal be paid during the 25-year term. And, Southern guaranteed 90 per cent of the first mortgage obligation. Appellants assail the purpose and terms of these mortgages and the guarantee: their purpose—to make it unnecessary for the tenants to use working capital; their terms—lower than the prevailing market terms. Southern justifies the plan as a means of protecting itself, in the event the Terminal project failed. There is no question of the importance to a railroad of the land adjacent to its lines. Such property has strategic traffic-producing potentiality and is vital for any possible future construction of new lines. The explanation is for the jury.

D. The final paragraph of the charge summarizes the issue and puts the question squarely to the jury.

> "When new facilities are constructed by a railroad and rented to tenants whose business includes the shipment or receipt of rail freight as owners or as consignees or consignors the total rental charged must not be less than an amount which will fully cover a fair return on that plus taxes, insurance, depreciation and maintenance and no such new construction should be undertaken unless there is assurance with all reasonable certainty that such rentals can and will be collected. (And that's to be taken in connection with my previous instruction to you that if it is intended that the purchase plan be carried out you would strike from that the factor of depreciation in computing a compensatory rental.)"

This part of the charge is based directly on Practices of Carriers—Packing Sheds, 1941, 246 I.C.C. 273, 283. The appellants requested the charge, except the portion in parentheses. In deciding the first major issue, the jury had to sift uncertain and fluctuating variables in the concept of a "fair return", as well as to weigh contradictory testimony and inferences. Taking the record as a whole, substantial evidence supports the jury's finding.

### IV.

The second major issue submitted to the jury dealt with the collection of rent from the tenants.

A. The district judge charged the jury: "Did the Southern Railroad, in view of all the circumstances disclosed by the evidence, exercise due diligence in collecting the rent charged?" The appellants excepted to the charge on two grounds: (1) "due diligence" is not the test; (2) unqualified and undefined, as it was in the charge, the "due diligence" test permitted the jury to speculate and consider immaterial facts.

A carrier by failing to collect its charges extends credit, thereby unlawfully furnishing working capital to a debtor, shipper or tenant. Thus, when a railroad extended four months' credit to a shipper on freight bills, the court considered the extension an undue concession because it was equivalent to the carrier's lending the shipper money at

no interest. Hocking Valley R. Co. v. United States, 6 Cir., 1914, 210 F. 735, certiorari denied 234 U.S. 757, 34 S.Ct. 675, 58 L.Ed. 1579. The statutory test, however, is one of reasonableness. The Act condemns "undue or unreasonable" concessions. In the Hocking Valley cases, there was no evidence of due diligence by the carrier; the indictment charged that the carrier made no demand for payment and made no effort to collect the debt. The court stated the problem as one depending on the facts of the case:

> "We do not say that all credit or forbearance is discrimination. A practice by which those shippers or consignees who had established their financial credit and satisfactory business habits were suffered to delay payment until convenient, but frequent, settlement periods, while others were required to pay cash on delivery, might not be of itself, forbidden. Delays caused by inability to collect or an extension of time given as the best means of treating a past-due and doubtful freight account, might be justified. These thoughts do not reach a case where it was agreed before shipment that the favored should have the incidental delays and forbearance customarily given to all shippers, and should then, in addition, receive a considerable further extension of credit while cash payment was then to be collected from all others." 210 F. at page 744.

In view of the language of the statute prohibiting *undue* concessions, the charge properly instructed the jury to consider whether the defendants exercised *due* diligence in collecting the rent. Appellants do not suggest, here or in their requested charges, that the law imposed a higher degree of duty on the carrier.

When a trial judge instructs a jury in plain language, using common words to express a clear thought he is under no duty to paint the lily. An unnecessary definition or useless qualification is more likely to obscure than to clarify. Here, the only possibility of the jury's misunderstanding was eliminated by the court's further charge restricting "all of the circumstances disclosed by the evidence" to "every circumstance that bears on that issue, fail[ure] to exercise due diligence to collect that rent". The question of eliminating certain circumstances or issues from the jury's consideration could be raised, and was raised below, by the defendants' requested charges. The trial judge properly charged the jury.

B. There is considerable evidence in support of the plaintiffs' position. Some of the tenants, including tenants not competitors of the plaintiffs, had poor credit ratings and were thinly capitalized corporations. Nelson Company, one of the plaintiffs' direct competitors, had a net capital of only $4,400 and paid a monthly rental of $7,760 for cold storage warehouse facilities expected to cost $1,000,000 that finally cost $1,400,000. The company was sent no rent bill for ten months. When the first six months' rent was long overdue, Southern, in effect, postponed payment for another six months by taking a note for the rent. It was never paid. The company was sued for arrearages of $135,000. While at the Terminal its revenues amounted to $212,000 in 1957 and $293,000 in 1958. Operating losses mounted, but Nelson increased officers' salaries, paid off back salaries to its president, and offered free services in handling the delivery of goods. Nelson was expected to produce 2500 carloads of freight a year. Birmingham Terminal Cold Storage, the other direct competitor of the plaintiffs, was usually six months in arrears, operated on a profit for only two months, and when it left the Terminal, was $65,000 in arrears for rent. The facilities constructed for these two companies were leased to a newly formed corporation, the Jefferson Company, owned by a man who had under lease similar facilities in Chattanooga, Tennessee. At the time he took over the space in the Birmingham

Terminal, he owed from $65,000 to $98,-000 on his Chattanooga lease.

 The jury heard all of this. It heard that Nelson moved in fourteen months before the Terminal was completed; that the president of the company was ill for four months. It heard that a bona fide dispute between the Terminal and all of its tenants as to the rental-sale cost-base held up collections at the start and impeded collections until settled by a suit for a declaratory judgment. It heard too that Nelson Company had a "good" credit rating; that the operator of the Birmingham Cold Storage Company had a "good" credit rating and had developed a prosperous cold storage business in Gadsden, Alabama. Prompt eviction is not necessarily the best way to collect rent. There is evidence that Southern made reasonable efforts to collect the rentals, sent out bills promptly after the dispute with the tenants was settled, took a note from the president of Nelson Company to aid, not impede, collection of the rent, and made other efforts to collect—short of eviction. Southern, according to its evidence, exercised a reasonable business discretion, then when the efforts to collect proved fruitless, Southern required Nelson and The Birmingham Terminal Cold Storage to vacate the premises, and filed suit for rent arrearages. There is no evidence in the record that Southern had any agreement or understanding with any tenant that rents were not to be paid or that rents might be delayed.

We cannot say, as a matter of law, that the failure to collect rentals was so lacking in diligence that it constituted a violation of the Act. The trial judge properly submitted the question to the jury. Sufficient evidence supports the jury's verdict.

## V.

 "A cause of action does not necessarily arise from those acts and omissions of a common carrier that may subject it to a criminal prosecution by the government, or to corrective and coercive proceedings at the instance of the Commission." Pennsylvania R. R. Co. v. International Coal Mining Co., 1913, 230 U.S. 184, 33 S.Ct. 893, 900, 57 L.Ed. 1446. To recover damages in private litigation, the plaintiff must prove a specific injury resulting from the carrier's acts and omissions.

A. In this case the evidence showing the causal connection between Southern's rental practices and the plaintiffs' loss of business is thin. There is no direct evidence that Southern controlled the rates and business practices of the plaintiffs' competitors at the Terminal, or that these rates and business practices (not honest competition) were the cause of plaintiffs' alleged loss.

Boggs, a company in the cold storage since 1948, contends that the Terminal forced it out of this business; it is now in the brokerage business. But Boggs was losing customers to other warehouses than the Terminal before the Terminal began in business. It is not shown that any particular customer left Boggs because of reduced rates or other attractions offered by tenant-competitors at the Terminal. At least one former customer of Boggs said that he was forced to withdraw because of "prohibitive rates".

Since 1927 Shaw has operated a public dry storage warehouse business, stored food and other products, and maintained rental offices for food brokers. Shaw has two warehouses served by Southern. It is far from clear that Shaw showed any injury or loss of business during the relevant years. Mr. Shaw testified that Nelson solicited his customers and offered them free delivery and air conditioned offices, but the record does not show that Nelson's solicitations induced any customers to leave. Mr. Shaw testified that he lost three customers. Two went to other warehouses than the Terminal's, and the third was only a potential customer. Operating income rose from $202,000 in 1955 to $346,000 in 1958. During the time when competition with the Terminal was greatest, the company

increased the president's salary from $13,000 to $24,700. In 1955 Shaw Warehouse doubled its storage by constructing an addition to its main building that added 35,000 square feet of storage space. In 1957 Shaw Warehouse leased buildings in Birmingham containing additional space. The company has consistently operated at a profit.

Birmingham Ice, founded in 1881, has operated a public cold storage business since 1915. Birmingham Ice supports its case somewhat better than the other plaintiffs. Its cold storage department operated at a profit in 1955 and 1956 but at a loss in 1957 and 1958. Still, Birmingham Ice was doing well enough to increase the salary of its president from $21,800 in 1956 to $26,000 in 1958; and, in 1957 its president found that he could devote one-fourth of his time to a new business. Birmingham Ice contended that it lost all or part of twenty accounts.

None of the plaintiffs' customers, allegedly lost to a Terminal tenant, was called to tell why he had changed warehouses. Mr. Nelson was not called on to testify.

Southern argues that the plaintiffs operated multistory structures that were obsolescent; that whatever advantages Terminal tenants enjoyed were because of the efficiency of the facility and not because of any concessions. Representatives of the complainant warehouses attended the first meetings of the group organizing the Terminal. There is evidence that as early as 1954 Mr. Shaw objected, he said, "to the very thought" of the Terminal; that in 1955 the head of Birmingham Ice sought to dissuade Southern from promoting the project on the ground that there was enough cold storage business in Birmingham only for his company and Boggs. A jury might infer that "the Birmingham warehousemen naturally did not relish facing the chill wind of this competition;"[20] that the plaintiffs' losses resulted solely from the construction of the Terminal and not the carrier's unlawful rental practices. Or, the jury might infer that Southern kept its warehouse tenants in business to prey on the plaintiffs' accounts. It is not for us to choose between these inferences. Even assuming that the defendants violated the Act, the record supports the verdict on the basis that Shaw failed to prove any injury and that none of the plaintiffs successfully carried the burden of proving that the defendants' violations of the Act caused the plaintiffs' business losses.

■ B. The district court charged the jury that to sustain the burden of proof the plaintiffs were required to prove that their losses were "the direct result of some wrongful act of the defendants"; that the concessions must have been "the direct cause of some injury to the plaintiffs". This, they say, placed a higher burden of proof on the plaintiffs than the statute required. As they see it, they are entitled to all damages, direct, indirect, or consequential, flowing from unlawful railroad practices.

The Act uses the language "damages sustained in consequence of any such violation". 49 U.S.C.A. § 8. In Pittwood, the Commission held for the carrier, stating that the warehouseman's damages "were not the direct and proximate consequences * * *" In Terminal Warehouse Co., 31 F.2d 951 the court noted that in the I.C.C. proceeding (finally approved in Merchants' Warehouse Co., 283 U.S. 501, 506, 51 S.Ct. 505, 75 L.Ed. 1227) the Commission refused an award of reparation, stating that the loss was not attributable directly to the alleged unlawful practices. In Pennsylvania R. Co. v. International Coal Mining Co., 1913, 230 U.S. 184, 33 S.Ct. 893, 900, 57 L.Ed. 1446, the Court said that the "right to recover is limited to the pecuniary loss suffered and proved"; in Keogh v. Chicago & N. W. R. Co., 1922, 260 U.S. 156, 43 S.Ct. 47, 50, 67 L.Ed. 183, the Court, referring to the damages recoverable under Sec-

20. This is the language of Commissioner Webb, dissenting, in Shaw Warehouse v. Southern Railway Co., 1959, 308 I.C.C. 609, 640.

tion 8 of the Commerce Act, pointed out that "these damages must be proved by facts from which their existence is logically and legally inferrable"; and, in Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 250, 75 L.Ed. 544, the Court held that "it was open to the jury to find that the price cutting and the resulting lower prices were *directly* attributable to the unlawful combination".

The trial below was on the issue of liability only. The plaintiffs were spared the necessity of proving specific pecuniary loss and distinguishing between what was a direct loss and what was an indirect loss. The trial judge instructed the jury it was not to burden itself with "how much damage or injury was sustained by each plaintiff, but only as to whether the evidence satisfies your mind that at least some injury or damage resulted to each plaintiff as a result of a violation" of the Act. This instruction is broad enough for the jury to find that the injury was in market losses of customers and profits. We think that the statutory clause, "damages in consequence of any such violations" means damages that are "the direct result" of such violations. But considering the charges as a whole, the trial court made it plain to the jury that the plaintiffs need show only that "some injury or damage resulted" from the defendants' violations of the Act. This was as favorable an instruction as the plaintiffs could expect.

## VI.

Appellants complain bitterly that the trial court permitted Southern's attorneys to engage in improper arguments, addressed to class hatred, that reached "the very nadir of irradicable prejudice". They say that throughout the trial opposing counsel misled the jury by picturing the railroad as the friend and champion of the poor against the warehousemen, pictured as rich and powerful exploiters of the defenseless. This, we may assume, must have taken a little doing—and an unusual jury. Appellants particularly object to the argument to the jury that the president of the Birmingham Ice and Cold Storage Company was as callous of poor struggling housewives as was Marie Antoinette. Southern's counsel equated testimony that warehouse prices affected food prices "[a] penny a pound" with the well known eighteenth century remark, "let them eat cake". Aside from the error of counsel in attributing the remark to Marie Antoinette, a common mistake,[21] there was no other error. At least, there was no reversible error. The trial below was a long hard-fought battle in one of a number of wars between the parties. The record reads as if the case were an anti-trust suit. Able counsel for both sides relied on a sort of economic argumentum ad misericordium. We do not endorse this argument nor the allusion to Marie Antoinette. However, the latitude allowed lawyers in cross-examination and in argument to a jury, and the conduct of a trial generally, must rest in the sound discretion of the trial judge. The district judge was scrupulously fair. We find no impropriety the trial judge inferentially approved, in abuse of his judicial discretion. Even considering the total effect of all the allegedly improper statements, we find no impropriety of such proportions as to require reversal and remand of the case.

Judgment is affirmed.

21. Evans, Spoor of Spooks 63 (1954); Stevenson, Book of Proverbs, Maxims, and Familiar Phrases 274(5) (1948).